FILED

06/09/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0147

DA 24-0147

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2025 MT 120

PLANNED PARENTHOOD OF MONTANA,
and SAMUEL DICKMAN, M.D., on behalf of
themselves and their patients,

      Plaintiffs and Appellees,

    v.

STATE OF MONTANA, by and through AUSTIN
KNUDSEN, in his official capacity as Attorney General,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV-21-999
Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Austin Knudsen, Montana Attorney General, Michael Russell, Thane
Johnson, Alwyn Lansing, Michael Noonan, Assistant Attorneys General,
Helena, Montana

      For Appellees:

            Raph Graybill, Graybill Law Firm, PC, Great Falls, Montana

            Dylan Cowit, Planned Parenthood Federation of America, Inc., New York,
New York

            Diana O. Salgado, Planned Parenthood Federation of America, Inc.,
Washington, District of Columbia

            Michelle Nicole Diamond, Alan E. Schoenfeld, Alex W. Miller, Sean C.
Chang, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York

            Peter Kurtz, Wilmer Cutler Pickering Hale and Dorr LLP, Denver,
Colorado

            Kimberly Parker, Nicole Rabner, Wilmer Cutler Pickering Hale and Dorr
LLP, Washington, District of Columbia

Gene R. Jarussi, Attorney at Law, Billings, Montana

For Amici Curiae Montana Constitutional Convention Delegates and Research Staff:

Kyle Anne Gray, Brianne C. McClafferty, Holland & Hart LLP, Billings, Montana

Emily J. Cross, Attorney at Law, Billings, Montana

For Amici Curiae The Center for Reproductive Rights and ACLU of Montana Foundation:

Alex Rate, Marthe VanSickle, ACLU of Montana Foundation, Inc., Missoula, Montana

Amy Myrick, Center for Reproductive Rights, New York, New York

For Amici Curiae American College of Obstetricians and Gynecologists, American Academy of Family Physicians, American Academy of Nursing, American Academy of Pediatrics, American College of Medical Genetics and Genomics, American College of Nurse-Midwives, American College of Physicians, American Gynecological and Obstetrical Society, American Medical Association, American Society for Reproductive Medicine, Montana Chapter of the American Academy of Pediatrics, Society of Family Planning, Society for Maternal-Fetal Medicine, and National Association of Nurse Practitioners in Women's Health:

Rylee Sommers-Flanagan, Mikaela Koski, Upper Seven Law, Helena, Montana

Nicole A. Saharsky, Mayer Brown LLP, Washington, District of Columbia

For Amici Curiae Asian Pacific Institute on Gender-Based Violence, Aspen, Caminar Latino/Latinos United for Peace and Equity, District 4 Human Resources Development Council, Domestic and Sexual Violence Services of Carbon County, Idaho Coalition Against Sexual & Domestic Violence, Legal Voice, Montana Coalition Against Domestic & Sexual Violence, National Network to End Domestic Violence, Safe in the Bitterroot, Sanders County Coalition for Families, Sexual Violence Law Center, Ujima, The National Center on Violence Against Women in the Black Community, Victim-Witness Assistance Services, and WA State Coalition Against Domestic Violence:

Matthew Gordon, Perkins Coie LLP, Seattle, Washington

Submitted on Briefs:  November 20, 2024
Decided:  June 9, 2025

Filed:

_____
Clerk

2

Justice Beth Baker delivered the Opinion of the Court.

¶1 The State of Montana appeals a Thirteenth Judicial District Court order that declared unconstitutional and permanently enjoined the enforcement of three laws passed by the 2021 Montana Legislature regulating abortion. We address the following issues on appeal:

*1. Does a 20-week ban on abortions violate Montana's constitutional guarantees of individual privacy or equal protection of the law?*

*2. Do restrictions on medication abortions and requirements that providers give patients certain information violate Montana's constitutional guarantees of individual privacy and free speech?*

*3. Does a law mandating that providers offer patients the opportunity to view an ultrasound and listen to a fetal heart tone violate Montana's constitutional guarantee of individual privacy?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Plaintiffs in this action are Planned Parenthood of Montana and Dr. Samuel Dickman, M.D., Planned Parenthood of Montana's Chief Medical Officer (collectively, "PPMT").[1] They challenge three laws passed by the 2021 Montana Legislature: HB 136, HB 140, and HB 171, each imposing new regulations or restrictions on abortion care in Montana. PPMT provides two types of abortion: medication and procedural. For medication abortions, patients take two medications (mifepristone and misoprostol), typically 24 to 48 hours apart. PPMT provides medication abortions up to 11 weeks from

---

[1] Originally, plaintiffs were PPMT and Dr. Joey Banks, M.D. The District Court granted Plaintiffs' unopposed motion to dismiss Dr. Joey Banks and substitute Dr. Samuel Dickman after Dr. Dickman became PPMT's new Chief Medical Officer.

3

the first day of the patient's last menstrual period and procedural abortions up to 21 weeks and 6 days from the first day of the patient's last menstrual period.

¶3     HB 136 (codified in §§ 50-20-601 through -606, and -109, MCA) prohibits abortion at twenty weeks from the first day of the patient's last menstrual period.  2021 Mont. Laws ch. 307, § 3.  The law permits narrow exceptions to "prevent a serious health risk" to the mother or in case of medical emergency but explicitly excludes the mother's psychological or emotional conditions.  2021 Mont. Laws ch. 307, §§ 2(4), 2(9), 3(2)-(3).  Providers in violation are subject to civil penalties and felony criminal charges.  2021 Mont. Laws ch. 307, §§ 4-5.  The preamble includes a legislative conclusion that fetuses can experience pain by 20 weeks gestation and asserts a compelling state interest in protecting fetuses from "the stage at which substantial medical evidence indicates" that they can feel pain. 2021 Mont. Laws ch. 307, Preamble.

¶4     HB 171 (codified at §§ 50-20-701 through -714, MCA) imposes numerous restrictions on medication abortions and exposes providers to civil and criminal penalties. 2021 Mont. Laws ch. 309.  The restrictions include a ban on telehealth abortions, a requirement for multiple in-person visits, a state-mandated informed consent form, a 24-hour waiting period between the form and receiving the medication, and various reporting and credentialing requirements.  2021 Mont. Laws ch. 309, §§ 4-5, 7-9.

¶5     HB 140 (codified at §§ 50-20-105(4), and -113, MCA) requires providers to offer patients the opportunity to view two forms of ultrasound and listen to a fetal heart tone before an abortion and requires the patient to sign a form created by the State indicating their choice.  2021 Mont. Laws ch. 308, § 1.

4

¶6 PPMT filed a complaint in Yellowstone County District Court challenging the laws as unconstitutional and seeking a preliminary injunction.[2] The District Court granted the preliminary injunction, and the State appealed. This Court affirmed the preliminary injunction of all three laws in *Planned Parenthood of Montana v. State*, 2022 MT 157, ¶¶ 2, 61, 409 Mont. 378, 515 P.3d 301. Following discovery, PPMT filed for summary judgment under M. R. Civ. P. 56. PPMT argued that under Article II, Sections 4, 7, and 10, of the Montana Constitution, HB 136 violated the rights to privacy and equal protection and was unconstitutionally vague; HB 171 violated the rights to privacy and free speech and was unconstitutionally vague; and HB 140 violated the rights to privacy and free speech. PPMT did not raise challenges under the United States Constitution. The State filed a cross-motion for summary judgment on only HB 136 and opposed PPMT's motion.

¶7 Both parties submitted evidence, including deposition testimony from their witnesses and experts, as well as responses and objections to discovery requests. PPMT witnesses included Martha Fuller (PPMT's President and CEO, deposed under M. R. Civ. P. 30(b)(6)), Dr. Samuel Dickman, M.D. (PPMT's Chief Medical Officer), Dr. Colleen McNicholas, DO, MSCI, FACOG (a board-certified obstetrician-gynecologist who is the Chief Medical Officer of Planned Parenthood of the St. Louis Region and Southwest Missouri), and Dr. Steven Ralston, M.D., MPH (a board-certified obstetrician-gynecologist). PPMT also submitted copies of its consent and education forms

---

[2] Plaintiffs also brought additional claims challenging a separate law—HB 229. The parties later stipulated to dismissal of claims regarding HB 229, and challenges to this law are not on appeal.

used to counsel patients in reproductive health care decision-making (filed under seal);[3] a study by the National Academies of Sciences, Engineering, and Medicine that examined 40 years of studies, trials, research, and literature on the safety and quality of abortion care (hereinafter, "the National Academies Study");[4] information on abortion care from the American College of Obstetricians and Gynecologists; and Montana data and vital statistics on abortion outcomes and gestational age of births.

¶8    The State's experts and witnesses included Dr. Ingrid Skop, M.D. (a board-certified obstetrician-gynecologist), Dr. George Mulcaire-Jones, M.D. (a board-certified family medicine physician), and Dr. Robin Pierucci, M.D., M.A., FAAP (a neonatologist and medical director of a neonatal intensive care unit).  Additional deposition testimony included M. R. Civ. P. 30(b)(6) witnesses from the Montana Department of Health and Human Services (DPHHS), the Office of the Montana Attorney General, and the Abortion Reversal Network.

¶9    The court received all of the evidence, heard oral arguments, and granted summary judgment to PPMT after concluding that the challenged laws violated provisions of the Montana Constitution, including the right to privacy.  It permanently enjoined the enforcement of all three laws.  The State appeals.

---

[3]  Pursuant to a joint stipulated protective order, the District Court granted PPMT's motion to file the consent and education forms under seal.  This Court notes that order and references the forms generally without disclosing any of the non-public information designated as confidential.

[4] The National Academies of Sciences, Engineering, and Medicine was established by Congress to advise the nation on issues related to science, technology, engineering, medicine, and health. Members are elected by their peers for outstanding contributions to the fields.  It produces independent, objective publications that present evidence-based consensus on different issues. *About Us*, Nat'l Acads. of Scis., Eng'g, and Med., https://perma.cc/JRV5-6ZD6.

**STANDARD OF REVIEW**

¶10 This Court reviews a District Court's grant of summary judgment de novo, applying the criteria of M. R. Civ. P. 56. *Sands v. Town of W. Yellowstone*, 2007 MT 110, ¶ 15, 337 Mont. 209, 158 P.3d 432. "The moving party must establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Sands*, ¶ 15 (citing *Baltrusch v. Baltrusch*, 2006 MT 50, ¶ 11, 331 Mont. 281, 130 P.3d 1267). Once a moving party meets this burden, the opposing party must present material and substantial evidence essential to one or more elements of its case (rather than mere conclusory or speculative statements) to raise a genuine issue of material fact. *Sands*, ¶ 15; *Rich v. Ellingson*, 2007 MT 346, ¶ 12, 340 Mont. 285, 174 P.3d 491 (citation omitted). All reasonable factual inferences must be drawn in favor of the party opposing the motion. *Hajenga v. Schwein*, 2007 MT 80, ¶ 12, 336 Mont. 507, 155 P.3d 1241. "[T]he fact that both parties have moved for summary judgment does not establish, in and of itself, the absence of genuine issues of material fact." *Sands*, ¶ 17 (quoting *Hajenga*, ¶ 18). We evaluate each party's motion on its own merits. *Sands*, ¶ 17 (citing *Hajenga*, ¶ 18).

¶11 "This Court's review of constitutional questions is plenary." *Williams v. Bd. of Cnty. Comm'rs of Missoula Cnty.*, 2013 MT 243, ¶ 23, 371 Mont. 356, 308 P.3d 88 (citing *Walters v. Flathead Concrete Prods.*, 2011 MT 45, ¶ 9, 359 Mont. 346, 249 P.3d 913). We review for correctness a district court's resolution of an issue regarding a question of constitutional law. *Bryan v. Yellowstone Cnty. Elem. Sch. Dist. No. 2*, 2002 MT 264, ¶ 16, 312 Mont. 257, 60 P.3d 381. "The severability of an unconstitutional provision from a

statute is a matter of statutory interpretation" that we review for correctness. *Williams*, ¶ 24 (citations omitted).

## DISCUSSION

**The Analytical Framework for Reviewing PPMT's Privacy Claims**

¶12 The Montana Constitution makes the right to privacy explicit: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Mont. Const. art. II, § 10. This Court first discussed personal autonomy as part of Montana's right to privacy in *Gryczan v. State*, 283 Mont. 433, 942 P.2d 112 (1997). In *Gryczan*, we held that a state statute violated the right to privacy, and thus was unconstitutional, when it prohibited "consensual, private, same-gender sexual conduct between adults." *Gryczan*, 283 Mont. at 438, 942 P.2d at 115.

¶13 *Gryczan* reasoned that

> [u]nlike the federal constitution, Montana's Constitution explicitly grants to all Montana citizens the right to individual privacy . . . . Since the right to privacy is explicit in the Declaration of Rights in Montana's Constitution, it is a fundamental right and any legislation regulating the exercise of a fundamental right must be reviewed under a strict-scrutiny analysis . . . . [T]he legislation must be justified by a compelling state interest and must be narrowly tailored to effectuate only that compelling interest.

*Gryczan*, 283 Mont. at 448-49, 942 P.2d at 121-22. This Court rejected the State's argument that the United States Supreme Court holding in *Bowers v. Hardwick*, 478 U.S. 186, 106 S. Ct. 2841 (1986) (concluding there is no privacy right under the federal constitution to consensual, adult, same-gender sexual conduct) (overruled by *Lawrence v. Texas*, 539 U.S. 558, 123 S. Ct. 2472 (2003)) precluded the protection of this right under Article II, Section 10, of the Montana Constitution. *Gryczan*, 283 Mont. at 450, 942 P.2d

at 121 ("Regardless of whether *Bowers* was correctly decided, we have long held that Montana's Constitution affords citizens broader protection of their right to privacy than does the federal constitution."). Having concluded the statute constituted a governmental intrusion into a privacy right, the Court held the law failed strict scrutiny. *Gryczan*, 283 Mont. at 456, 942 P.2d at 126.

¶14 We recognized in *Gryczan* that the Legislature's undisputed public policy-making power cannot exceed the parameters of the Constitution. *Gryczan*, 283 Mont. at 454, 942 P.2d at 125. It is the obligation of the courts and Legislature, and an oath taken by every justice, judge, and legislator in this State, to "scrupulously support, protect and defend those rights and liberties guaranteed to all persons under our Constitution," including the right to privacy. *Gryczan*, 283 Mont. at 455, 942 P.2d at 125. Under the Montana Constitution,

> the right of individual privacy—that is, the right of personal autonomy or the right to be let alone—is fundamental. It is, perhaps, one of the most important rights guaranteed to the citizens of this State, and its separate textual protection in our Constitution reflects Montanans' historical abhorrence and distrust of excessive governmental interference in their personal lives.

*Gryczan*, 283 Mont. at 455, 942 P.2d at 125.

¶15 The records of the 1972 Constitutional Convention undergird the expansive privacy right discussed in *Gryczan*. *See Mont. Dem. Party v. Jacobsen*, 2024 MT 66, ¶ 18, 416 Mont. 44, 545 P.3d 1074 (citing *Bd. of Regents of Higher Educ. of Mont. v. State*, 2022 MT 128, ¶ 11, 409 Mont. 96, 512 P.3d 748) ("The Framers' intent controls our interpretation of a constitutional provision."). Article II, Section 10, of the Montana Constitution was adopted unanimously by the Bill of Rights committee to elevate the "right

of privacy to explicit Constitutional status." Montana Constitutional Convention, Committee Proposals, February 23, 1972, Vol. II, p. 632 [hereinafter Conv. Comm. Proposals]. The Committee Report Comments referenced both increased concerns about the impacts of an advanced technological society and *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678 (1965) (holding that an implied privacy right in the U.S. Constitution protected the right of married couples to use contraception). Conv. Comm. Proposals, Vol. II, p. 632. The committee proposed a broad provision to "permit flexibility to the courts in resolving the tensions between public interests and privacy" but also hoped "the [L]egislature will have occasion to provide additional protections for the right of privacy in explicit areas where safeguards are required." Conv. Comm. Proposals, Vol. II, pp. 632-33.

¶16 When Delegate Bob Campbell introduced the proposal to the entire convention, he discussed the importance of an express right to privacy in the Montana Constitution given the lack of any corresponding right in the federal constitution or in the former Montana constitution. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, Vol. V, p. 1680 [hereinafter Conv. Tr.]. Delegate Campbell discussed increasing technological surveillance and again explicitly referenced *Griswold*, describing that "the state did not have a compelling state interest in going into the bedroom of a married couple to prevent contraception." Conv. Tr., Vol. V, p. 1681.

¶17 Delegate Campbell went on to express concerns about the future interpretations of the implied right to privacy at the federal level after *Griswold*, stating, "[W]e don't know

10

how the interpretations will go from there, what the [U.S.] Supreme Court will do." Conv. Tr., Vol. V, p. 1681. He acknowledged that

> the state must come into our private lives at some point; but what it says is, don't come into our private lives unless you have a good reason for being there. We feel that this, as a mandate to our government, would cause a complete reexamination and guarantee our individual citizens of Montana this very important right—the right to be let alone; and this has been called the most important right of them all.

Conv. Tr., Vol. V, p. 1681. Delegate Campbell stressed that the committee did "not try to define the right, to put in specific examples" because it would be "running a risk" of eliminating "other areas in the future which may be developed by the court." Conv. Tr., Vol. VI, p. 1851.

¶18 Through the convention debates, the Delegates contemplated the right to privacy impacting other enumerated rights. Conv. Tr., Vol. V, pp. 1684–85 (discussing the overlap of the right to privacy within the search and seizure context); Conv. Tr., Vol. VII, p. 2488 (discussing right to privacy in context of the right to know provision); Conv. Tr., Vol. V, p. 1730 (raising concerns that defeating a proposed amendment in the right to bear arms provision "tacitly violat[es]" the right to privacy). Thus, the Declaration of Rights in Montana's Constitution is not a set of "disconnected and discrete rules" but rather "encompasses a cohesive set of principles, carefully drafted and committed to an abstract ideal of just government," with overlapping rights and guarantees. *Armstrong v. State*, 1999 MT 261, ¶ 71, 296 Mont. 361, 989 P.2d 364. *Gryczan* reflected the 1972 Constitutional Convention's intent that Article II, Section 10, of the Montana Constitution

11

encompass a broad privacy right reflecting personal autonomy and the right to be left alone. *See Gryczan*, 283 Mont. at 455, 942 P.2d at 125.

¶19    In *Armstrong*, medical providers and a health clinic challenged the constitutionality of two statutes that prohibited physician assistants from performing abortions. *Armstrong*, ¶ 1. *Armstrong* had two central holdings. First, the right to privacy in Article II, Section 10, of the Montana Constitution "guarantees each individual the right to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from government interference." *Armstrong*, ¶ 14. Second, within this broad right, the right to privacy protects a patient's "right of procreative autonomy," which encompasses a person's "right to seek and to obtain a specific lawful medical procedure"—pre-viability abortion services. *Armstrong*, ¶ 14. *Armstrong* acknowledged that

> [i]n narrowly defined instances the state, by clear and convincing evidence, may demonstrate a compelling interest in and obligation to legislate or regulate to preserve the safety, health and welfare of a particular class of patients or the general public from a medically[]acknowledged, bona fide health risk. Subject to this narrow qualification, however, the legislature has neither a legitimate presence nor voice in the patient/health care provider relationship superior to the patient's right of personal autonomy which protects that relationship from infringement by the state.

*Armstrong*, ¶ 59 (emphasis omitted).

¶20    In reaching its conclusion, *Armstrong* explicitly acknowledged that the individual privacy right guaranteed under the Montana Constitution is greater than and separate from any such right implied in the federal constitution. "Montana adheres to one of the most stringent protections of its citizens' right to privacy in the United States—exceeding even

12

that provided by the federal constitution." *Armstrong*, ¶ 34 (citing *State v. Burns*, 253 Mont. 37, 40, 830 P.2d 1318, 1320 (1992); *Mont. Human Rights Div. v. City of Billings*, 199 Mont. 434, 439, 649 P.2d 1283, 1286 (1982)).

¶21 *Armstrong* cited *Gryczan*'s recognition of "personal autonomy" as part of "Montanans' fundamental constitutional right of individual privacy." *Armstrong*, ¶ 35 (citing *Gryczan*, 283 Mont. at 450-51, 942 P.2d at 123). It relied heavily on the 1972 Constitutional Convention transcripts to find an expansive privacy right that protects citizens "from legislation and governmental practices that interfere with the autonomy of each individual to make decisions in matters generally considered private." *Armstrong*, ¶ 33. *Armstrong* reiterated the Delegates' refusal to provide specific examples because they did not want to risk eliminating "other areas in the future which may be developed by the court." *Armstrong*, ¶ 36 (citing Conv. Tr., Vol VI, p. 1851).

¶22 *Armstrong* acknowledged the U.S. Supreme Court's recognition of a woman's right to obtain a pre-viability abortion without "undue burden," grounded in privacy under the Due Process Clause of the Fourteenth Amendment. *Armstrong*, ¶ 40 (citing *Roe v. Wade*, 410 U.S. 113, 153, 93 S. Ct. 705, 727 (1973); *Planned Parenthood v. Casey*, 505 U.S. 833, 846, 112 S. Ct. 2791, 2804 (1992)).[5] The opinion immediately, however, went on to point out that "*[n]otwithstanding, and independently of the federal constitution,* where the right of individual privacy is implicated, Montana's Constitution affords significantly

---

[5] *Roe* in part determined that a fetus does not enjoy a constitutionally protected status until "viability"—which means when the fetus could survive outside the womb. *Roe*, 410 U.S. at 163-64, 93 S. Ct. at 732). At the time, viability was estimated to be 26 weeks. *Armstrong*, ¶ 44 (citing *Roe*, 410 U.S. at 160, 162-65, 93 S. Ct. at 730-33).

13

broader protection than does the federal constitution." *Armstrong*, ¶ 41 (citing *Gryczan*, 283 Mont. at 448, 942 P.2d at 121) (emphasis added).

¶23 *Armstrong* thus explicitly and unequivocally acknowledged that the right of individual privacy—encompassing the right to personal and procreative autonomy—is protected separately under Montana's right to privacy, a broader provision independent of federal law. The Court distinguished the federal "undue burden" test, ruling that Montana's Constitution "requires more[,]" and "the government must demonstrate a 'compelling state interest' for infringing this right." *Armstrong*, ¶ 41 (citing *Gryczan,* 283 Mont. at 449, 942 P.2d at 122). The right to procreative autonomy was "encompassed within the broader personal autonomy protections afforded by the fundamental right of individual privacy guaranteed by Article II, Section 10[,] of the Montana Constitution." *Armstrong*, ¶ 42.

¶24 In *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 231, 142 S. Ct. 2228, 2242 (2022), the U.S. Supreme Court held that the right to abortion is not protected by an implied right in the Fourteenth Amendment of the U.S. Constitution, thus overturning *Roe* and *Casey*. In analyzing the stare decisis factors, the Court criticized the quality of *Roe*'s reasoning for a "viability" line. *Dobbs*, 597 U.S. at 274-78, 142 S. Ct. at 2268-70. The Court noted that when *Roe* was decided, viability was gauged at roughly 28 weeks but "today" may be 23 or 24 weeks. *Dobbs*, 597 U.S. at 276, 142 S. Ct. at 2269.

¶25 Here, the District Court reasoned that *Dobbs* is not controlling because "[f]ederal precedent is not binding on questions of state constitutional law." Unlike *Dobbs*, the Montana Constitution independently guarantees the right to procreative autonomy through

14

the point of viability. The court noted that *Armstrong* declined to define the point of viability, and that viability is a complex concept that varies case by case.

¶26 On appeal, the State argues that the District Court erred in disregarding *Dobbs*. It contends that *Armstrong* relied on *Roe* to find the right to a pre-viability abortion, that *Roe*'s overturning means the right no longer finds support under the Montana Constitution or the Court's rationale in *Armstrong*, and that *Dobbs* underscores Montana's numerous legitimate interests in regulating abortion. The State asserts that *Armstrong* suffers "the same untenable defect" as *Roe* of "rendering viability a judicially created arbitrary line without legal or medical justification." The State further contends that *Armstrong* incorrectly relied on certain statements of 1972 Constitutional Convention Delegates to determine the right to a pre-viability abortion exists as part of the right to privacy. The State asserts that the right of privacy was primarily meant to protect Montana citizens from increasing technological surveillance. It asserts that the 1972 Constitutional Convention intended the issue of abortion be left to the Legislature. In support of this assertion, the State points to a comment by Delegate Dahood during discussion on Article II, Section 3, of the Montana Constitution, and to various newspaper clippings and a newsletter covering the 1972 Constitutional Convention. The State maintains it is not asking this Court to overturn *Armstrong*, but instead to narrow it—namely by rejecting the viability standard and by applying a lesser standard of scrutiny.

¶27 PPMT argues that reconciling *Armstrong*'s holding with *Dobbs*, as the State requests, is "evisceration by another name." Stare decisis principles "all weigh in favor of reaffirming *Armstrong*'s holding that the Montana Constitution independently protects the

15

right to obtain pre-viability abortions." PPMT asserts that *Armstrong* was based on the express right to privacy in the Montana Constitution, which affords significantly broader protection than does the federal constitution. *Dobbs* does not change this holding, PPMT argues, and though *Armstrong* acknowledged federal protections for abortion, it was independent of the U.S. Constitution and "expressly and repeatedly grounded the right to pre-viability abortion in the express protections afforded by Montana's Constitution." PPMT contends a review of the 1972 Constitutional Convention transcripts supports this holding, and the State's arguments surrounding the 1972 Constitutional Convention do not defeat the correct reasoning of *Armstrong*.

¶28 Decades of established precedent have reaffirmed Montana's broad privacy right in numerous contexts. In the criminal context, we consistently have held that the right to be free from unreasonable searches and seizures in Article II, Section 11, of the Montana Constitution provides broader protection than does the Fourth Amendment in search and seizure cases because it is read in conjunction with the heightened privacy protection provided by Article II, Section 10. *See State v. Scheetz*, 286 Mont. 41, 46-47, 950 P.2d 722, 724-25 (1997) (reasoning that Montana has broader privacy protections in search and seizure jurisprudence, and U.S. Supreme Court law is "not determinative" of whether a government action constitutes a search); *State v. Martinez*, 2003 MT 65, ¶ 51, 314 Mont. 434, 67 P.3d 207 (declining to adopt U.S. Supreme Court reasoning on reliability requirements for anonymous tips in the search and seizure context because this "Court has repeatedly held that the unique language of Article II, Section 10[,] of the Montana Constitution, which establishes privacy as a fundamental right, affords greater protections

16

than the Fourth Amendment in cases involving searches of persons and property"); *State v. Goetz*, 2008 MT 296, ¶¶ 13, 54, 345 Mont. 421, 191 P.3d 489 (ruling that warrantless electronic monitoring of face-to-face conversations, with the consent of one party, does not constitute a search in violation of the Fourth Amendment but does constitute a search under Article II, Sections 10 and 11, of the Montana Constitution).

¶29 This Court has read an equally broad privacy right in the civil context. *E.g. Wenger v. State Farm Mut. Auto. Ins. Co.*, 2021 MT 37, ¶ 28, 403 Mont. 210, 483 P.3d 480 (concluding that "medical records fall within the zone of privacy protected by Article II, Section 10, of the Montana Constitution" and thus "deserve the utmost constitutional protection"); *Billings Gazette v. City of Billings*, 2013 MT 334, ¶ 59, 372 Mont. 409, 313 P.3d 129 (reasoning that employees' "reasonable expectation of privacy in their identities with regards to internal disciplinary proceedings" outweighs public disclosure under constitutional right to know provision); *State v. Nelson*, 283 Mont. 231, 242, 941 P.2d 441, 448 (1997) (noting that Article II, Section 10, of the Montana Constitution guarantees both "autonomy privacy" and "informational privacy").

¶30 The Legislature, as contemplated by the Framers, has enacted laws that also strengthen privacy rights of Montanans in a variety of civil and criminal arenas. *E.g.* §§ 20-25-511 through -516, MCA (protecting university students' records and residences as part of their privacy rights); §§ 40-4-216, 40-6-111, -120, MCA (relating to the confidentiality of hearings and records on parenting or paternity proceedings); § 61-7-114, MCA (making confidential vehicle accident reports); Title 44, ch. 5, MCA (creating laws "to establish effective protection of individual privacy in confidential and

nonconfidential criminal justice information"); 2025 Mont. Laws ch. 273 (HB 397) ("revising laws related to privacy in mental health digital service"); 2025 Mont. Laws ch. 382 (SB 282) (limiting "state government use of personal electronic data").

¶31 With this backdrop, we turn first to the State's argument that a viability line is no longer reasonable given the Supreme Court's holding in *Dobbs*. The State and the Dissent, ¶ 131, both fail to address that *Dobbs*'s central holding was that there was no *due process right* to an abortion under the Fourteenth Amendment of the federal constitution. *Dobbs*, 597 U.S. at 240, 142 S. Ct. at 2248. *Dobbs* noted that the right to privacy is not mentioned in the U.S. Constitution. *Dobbs,* 597 U.S. at 235, 142 S. Ct. at 2245. This is different from Montana's Constitution. Unlike the federal constitution, it contains an explicit privacy right that at its founding contemplated personal autonomy rights as part of the right to privacy. *Armstrong* clearly grounded its reasoning in the independent and broader protections of Montana's Constitution, separate from the federal constitution, to find that the right of personal and procreative autonomy, the right to make medical judgments affecting one's bodily integrity in partnership with a health care provider, and the right to a pre-viability abortion are protected by Montana's constitutional right to privacy. *Armstrong*, ¶¶ 14, 34, 48. *Dobbs*'s holding on the federal constitutional right to abortion under the due process clause is separate from *Armstrong*'s reasoning on the explicit privacy rights included in the Montana Constitution. *Armstrong*, ¶ 48.

¶32 The Dissent's complaint that the abortion right was not deeply rooted in Montana's history and tradition, Dissent, ¶¶ 132, 151, similarly is tethered to the federal analysis when examining whether a fundamental right is *implicit* in the Fourteenth Amendment's Due

18

Process clause. *E.g.*, *Dobbs*, 597 U.S. at 231, 142 S. Ct. at 2242; *Washington v. Glucksberg*, 521 U.S. 702, 720-21, 117 S. Ct. 2258, 2268 (1997) (when applying a substantive due process analysis to determine if an asserted fundamental right is protected by the Fourteenth Amendment, courts ask whether the right is "deeply rooted in this Nation's history and tradition . . . , and implicit in the concept of ordered liberty") (citations and internal quotations omitted). This is not the analysis we employ when examining a protection afforded by an *explicit* fundamental right guaranteed by the Montana Constitution, including the express right to privacy in Article II, Section 10. "[S]tate courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law." William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 491 (1997) (*reprinted in* Anthony Johnstone, *The Montana Constitution in the State Constitutional Tradition* 12 (2022)).

¶33    Given federal law at the time, *Armstrong* was correct when it used viability as the defining standard for permissible regulation. That *Roe* informed *Armstrong*'s reasoning does not invalidate the Court's analysis grounded separately in the Montana Constitution. *Armstrong*, ¶ 48. *Armstrong* did not adopt the trimester framework rule from *Roe* or the undue burden test from *Casey*. *Armstrong*, ¶ 41. In fact, *Armstrong*, unlike *Roe*, declined to define viability by gestational age and explicitly imposed a stricter test than *Casey*'s undue burden. *Armstrong*, ¶ 41. *Armstrong* recognized that "[f]ew matters more directly implicate personal autonomy and individual privacy than medical judgments affecting

19

one's bodily integrity and health[,]" and these decisions must "be made in partnership with a health care provider." *Armstrong*, ¶¶ 53, 58. The trust that a patient places in their medical or health care provider points to the "seriousness of the infringement of personal autonomy and privacy" when the government "through laws or regulations" usurps "the patient's own informed health care decisions made in partnership with his or her chosen health care provider." *Armstrong*, ¶ 58.

¶34 The State argues that because science keeps changing, a viability line is unworkable. This logic makes the very point *against* the law that the State attempts to defend. The statute now substitutes a fixed demarcation of 20 weeks. We agree with the District Court that viability is a "complex concept, applicable on a case-by-case basis, that requires medical judgment and may involve some margin for error. It is not reduceable to a gestational age." Determination of the viability of a fetus is subsumed within the health care provider and patient relationship and the medical judgment of the health care provider. Such judgments rest on the professional evaluation of qualified and licensed medical providers. *See Armstrong*, ¶ 62 (recognizing that "legal standards for medical practice and procedure cannot be based on political ideology, but, rather, must be grounded in the methods and procedures of science and in the collective professional judgment, knowledge and experience of the medical community acting through the state's medical examining and licensing authorities"). The government, whether through the Legislature or the courts, has no role in proclaiming when a fetus is viable over the judgment of a medical provider working with an individual to make private, autonomous decisions about their own health. A fixed gestational age that does not allow a provider's case-specific determination fails to

20

ensure that the government does not interfere with an individual's private medical decisions.

¶35 What is more, "viability" remains an appropriate standard because it is the point at which the fetus can survive outside the womb independently (with or without assistance). *See* § 50-20-104(6)(a), MCA (defining viability as "the ability of a fetus to live outside the mother's womb, albeit with artificial aid"). Until a fetus is viable and able to survive outside the womb, the right of personal autonomy belongs to the person on whose body the fetus depends. This reasoning is not without legal authority. Dissent, ¶ 157. Quite the opposite, it derives from the "overlapping and redundant rights and guarantees" the Montana Constitution preserves for all individuals, *Armstrong*, ¶ 71, including pregnant patients. *See* Mont. Const. art. II, § 3 ("All persons are born free and have certain inalienable rights [including] the rights of pursuing life's basic necessities, enjoying and defending their lives and liberties, . . . and seeking their safety, health and happiness in all lawful ways."); Mont. Const. art. II, § 4 ("The dignity of the human being is inviolable."). *See also Planned Parenthood of Mont. v. State*, 2024 MT 178, ¶ 56, 417 Mont. 457, 554 P.3d 153) (concluding that "a minor's right to dignity, autonomy, and the right to choose are embedded in the liberties found in the Montana Constitution). In contrast, we find no legal authority for the idea that the State's interest in preserving fetal life, or the fetus's right to life, takes precedence over all constitutional protections and dignities of the mother. The viability line thus strikes an appropriate balance of competing interests because it is the point at which the fetus has a life interest independent of the mother. Until then, the government may not intrude into the mother's private health decisions without a

21

compelling interest, narrowly tailored to address a specific health risk to her. *Weems v. State*, 2023 MT 82, ¶ 45, 412 Mont. 132, 529 P.3d 798; *Armstrong*, ¶¶ 58-59.

¶36 The State's argument that a change in the federal landscape mandates a change in this Court's holding overlooks our history of independently rooting the individual's fundamental personal autonomy right in Montana's right of privacy, even when not recognized at the federal level. *E.g.*, *Gryczan*, 283 Mont. at 448-49, 942 P.2d at 121-22 (Montana's right to privacy protects same-sex, consensual, sexual conduct despite the federal constitution not recognizing this privacy right). In *Lambert v. Wicklund*, the U.S. Supreme Court upheld a Montana law that required minors to notify their parents prior to obtaining an abortion (subject to certain exceptions). *Lambert v. Wicklund*, 520 U.S. 292, 299, 117 S. Ct. 1169, 1172 (1997). A Montana district court concluded the law was unconstitutional under Montana's Constitution, and the State did not appeal that decision. *Wicklund v. State*, No. ADV 97-671, 1999 Mont. Dist. LEXIS 1116 (Mont. First Jud. Dist. Feb. 11, 1999).[6] In *Mazurek v. Armstrong*, the U.S. Supreme Court held that the very statutes at issue in *Armstrong v. State* likely did not impose an undue burden within the meaning of *Casey* and thus reversed the Court of Appeals' grant of a preliminary injunction. *Mazurek v. Armstrong*, 520 U.S. 968, 971, 117 S. Ct. 1865, 1866 (1997) (citing *Casey*, 505 U.S. at 884, 112 S. Ct. at 2824). This Court also refused to follow the

---

[6] Plaintiffs brought an equal protection claim under Article II, Section 4, of the Montana Constitution. *Wicklund*, 1999 Mont. Dist. LEXIS 1116, *1. Employing an equal protection analysis, the District Court in *Wicklund* reasoned that there was not a suspect class, but the law infringed the fundamental right of privacy under Article II, Section 10, of the Montana Constitution, thus triggering strict scrutiny review. *Wicklund*, 1999 Mont. Dist. LEXIS 1116, *5, *6, *11.

U.S. Supreme Court's application of a form of rational basis review to an amendment prohibiting most federal funding of abortions. *Planned Parenthood of Mont. v. State*, 2024 MT 228, ¶ 34, 418 Mont. 253, 557 P.3d 440 (citing *Harris v. McRae*, 448 U.S. 297, 324 100 S. Ct. 2671, 2692 (1980)). We instead applied strict scrutiny, as the broader protections of the Montana Constitution demand when the State restricts abortion services or infringes on "the right of procreative autonomy in favor of birth[.]" *Planned Parenthood of Mont.*, 2024 MT 228, ¶ 34 (citing *Weems*, ¶ 35; *Planned Parenthood of Mont.*, 2022 MT 157, ¶ 20; quoting *Armstrong*, ¶ 49).

¶37 This Court can, and has, "broken with the United States Supreme Court precedent on independent state constitutional grounds when that Court has changed the protections afforded under the United States Constitution." *Mont. Dem. Party*, ¶ 21. It is especially telling that the Delegates, in enacting the right to privacy and referencing *Griswold*, commented on the uncertainty of the implied right to privacy at the federal level. Conv. Tr., Vol. V, p. 1681. *See Mont. Dem. Party*, ¶ 21 (citing *Roe*, 410 U.S. 113, 93 S. Ct. 705; *Dobbs*, 597 U.S. 215, 142 S. Ct. 2228) ("Implicit rights embedded in the United States Constitution are subject to expansion or contraction."). The Delegates sought to solidify privacy rights for Montanans under their state constitution—regardless of changes in federal interpretation.

¶38 We next address the State's arguments on the significance of comments by Delegate Dahood, as well as various newspaper clippings and newsletters covering the 1972 Constitutional Convention. Delegate Dahood's comments arose after Delegate Kelleher proposed an amendment to Article II, Section 3, attempting to confer constitutionally

23

protected status on a fetus at the time of conception.[7]  Conv. Tr., Vol. V, p. 1640.  In opposing this amendment, Delegate Dahood stated that Delegate Kelleher was attempting to prohibit abortion by constitutional command, which the Bill of Rights Committee decided was a legislative matter.  The proposed amendment was strongly rejected by the Delegates, with 15 voting in favor and 71 voting against.  In *Armstrong*, the State raised the argument—and this Court explicitly rejected it—that because the Convention rejected Delegate Kelleher's attempt to confer constitutionally protected status on a fetus at the time of conception, a woman's choice to obtain a pre-viability abortion was excepted from Article II, Section 10, and therefore the right was "subject to legislative determination and regulation within the parameters of the weaker protections afforded by the federal constitution and federal law."  *Armstrong*, ¶ 43.  *Armstrong* noted that the Convention determined *not* to deal with abortion in the Declaration of Rights "at this time" but "chose to leave the matter to the Legislature because of the historical debate as to 'when a person becomes a person.'"  *Armstrong*, ¶ 44 (quoting Conv. Tr., Vol. V, p. 1640).  "*Roe*, handed down a year after the Convention, resolved this debate from the legal standpoint, concluding that a fetus does not enjoy a constitutionally protected status—i.e., that a fetus is not a constitutional person—until 'viability.'"  *Armstrong*, ¶ 44.  This Court went on, however, to ground its holding not only in *Roe*, but also separately in the Montana Constitution.  *Armstrong*, ¶ 45 (citing the Delegates' concern that government interference be prohibited in private matters and their determination to adopt a broad and expansive

---

[7] Article II, Section 3, of the Montana Constitution provides, in part, that "[a]ll persons are born free and have certain inalienable rights."

24

privacy right "grounded in Montana's historical tradition of protecting personal autonomy and dignity," and concluding that Article II, Section 10, of the Montana Constitution protects "generally, the autonomy of the individual to make personal medical decisions and to seek medical care in partnership with a chosen health care provider free of government interference" and within the right of personal and procreative autonomy, the "right to obtain a pre-viability abortion").

¶39 Pointing to other comments and discussions in the Delegates' debates, amici curiae delegates and research staff from the 1972 Constitutional Convention argue that *Armstrong* is consistent with the Delegates' intent that the Montana Constitution *not* delegate to the Legislature the power to determine and define the scope of the enumerated privacy right. *See* Fritz Snyder & Mae Nan Ellingson, *The Lawyer-Delegates of the 1972 Montana Constitutional Convention: Their Influence and Importance*, 72 Mont. L. Rev. 53, 66 (2011). Numerous comments from individual Delegates reflect their vision of a limited legislative role in circumscribing the Constitution's individual rights. Conv. Tr., Vol. V, p. 1677 (comment of Delegate Schlitz that "we shouldn't be referring things to the Legislature from the Bill of Rights."); Conv. Tr., Vol. VII, p. 2496 (comment of Delegate Graybill that "we should not push on the Legislature the duty of determining what the rights of the people are in this state").[8] *Armstrong* is consistent with that intent. *See* Conv.

---

[8] Both comments by Delegate Schiltz and Delegate Graybill were during discussion of Article II, Section 9, of the Montana Constitution (the "right to know" provision). Their comments came while discussing the balance between the right to know and the right of privacy, both opposing an amendment that would have allowed the Legislature to "determine the situations in which individual privacy exceeds the merits of public disclosure." Snyder & Ellingson at 68, 70.

Comm. Proposals, Vol. II, pp. 632-33 (reasoning that the broad privacy right permits "flexibility *to the courts* in resolving the tensions between public interests and privacy. It is hoped that the legislature will have occasion to *provide additional protections* for the right of privacy in explicit areas where safeguards are required.") (emphasis added).

¶40    *Armstrong* noted the Bill of Rights Committee's reference to *Griswold*, which dealt with the "privacy interest inherent in contraception and procreation," and the "right to be let alone." *Armstrong*, ¶¶ 46-47. The Court reasoned that the specific references to *Griswold* were important because "decisions affecting marriage and childbirth are so intimate and personal that people must in principle be allowed to make these decisions for themselves, consulting their own preferences and convictions, rather than having society impose its collective decision on them." *Armstrong*, ¶ 47. Changes in federal law do not change the importance of the Framers' repeated and explicit references to *Griswold* in enacting the right to personal and procreative autonomy as part of the privacy right on which *Armstrong* partially based its reasoning. The defeat of Delegate Kelleher's amendment does not undermine the Delegates' intentions to create strong protections of personal autonomy. On its face, it was a resounding rejection of constitutionalizing fetal personhood. Delegate Dahood's statement exhorting his colleagues to defeat that proposition does not sideline the extensive discussion throughout the Convention about enacting an expansive privacy protection that would be committed to the courts for enforcement.[9]

---

[9] The Court rejected a similar argument in *Gryczan*, 283 Mont. at 451, 942 P.2d at 123, concluding that the Delegates' refusal to add in the Declaration of Rights an explicit protection for private

¶41 Finally, the State cites various newspaper articles and a newsletter covering the Convention that describe how abortion, among other issues, is not included in the Bill of Rights. The articles mention myriad other issues—for example, the right to work—that were not contained in the proposed version of the Declaration of Rights. Yet they are issues on which the Legislature has enacted laws that courts have reviewed under constitutional standards implicating fundamental rights. *E.g.*, *Wadsworth v. State*, 275 Mont. 287, 306, 911 P.2d 1165, 1176 (1996) (Article II, Section 3, of the Montana Constitution "explicitly protects the right to pursue life's basic necessities as an inalienable or fundamental right, which . . . includes the right to the opportunity to pursue employment as a necessary incident.). They do not support overturning decades of case precedent interpreting the right to privacy as an expansive right including the right to personal and procreative autonomy.[10]

¶42 The State additionally argues the "people must be able to be heard, through their elected representatives in the Legislature, on this important and heated social issue." On November 5, 2024, the people of Montana approved Constitutional Initiative No. 128. It

---

sexual acts between consenting adults did not mean the privacy clause did not protect this conduct. Though it does not mention *Gryczan*, the Dissent's criticisms of *Armstrong* (that abortion was criminalized in 1972, Dissent, ¶ 144, and that "'[p]ersonal autonomy' was not a phrase used by the Delegates or shared with the voters," Dissent, ¶ 154) also would call into question this Court's decision in *Gryczan*.

[10] The Dissent's reliance on the Voter Information Pamphlet and other sources available to the public, Dissent, ¶¶ 147-149, departs from this Court's well-established and longstanding reliance on the Constitutional Convention Transcripts as the authoritative source of the Framers' intent. *See e.g.*, *O'Neill v. Gianforte*, 2025 MT 2, ¶¶ 18-19, 420 Mont. 125, 561 P.3d 1018; *Cottonwood Env't Law Ctr. v. State*, 2024 MT 313, ¶¶ 10-13, 419 Mont. 457, 560 P.3d 1227; *Brown v. Gianforte*, 2021 MT 149, ¶¶ 34-43, 404 Mont. 269, 488 P.3d 548; *Nelson v. City of Billings*, 2018 MT 36, ¶ 14, 390 Mont. 290, 412 P.3d 1058; *State v. Schneider*, 2008 MT 408, ¶ 18, 347 Mont. 215, 197 P.3d 1020; *Mont. Env't Info. Ctr. v. Dept. of Env't Quality*, 1999 MT 248, ¶¶ 65-77, 296 Mont. 207, 988 P.2d 1236.

amends the Montana Constitution to expressly provide "a right to make and carry out decisions about one's own pregnancy, including the right to abortion." Mont. Const. art. II, § 36 (effective July 1, 2025). [11] CI-128 prohibits "the government from denying or burdening the right to abortion before fetal viability." This amendment is not effective until July 1, 2025, and thus has no impact on the legal issues here. It answers the State's point nonetheless: the people have been heard.

¶43 This Court is not persuaded that the State does not seek to overturn *Armstrong* but to "reconcile it." To hold, as the State explicitly requests, that the viability line no longer applies or that a lesser standard of scrutiny should be used would overturn several holdings of *Armstrong*. "[P]rinciples of law should be positively and definitively settled so that courts, lawyers and, above all, citizens may have some assurance that important legal principles involving their highest interests shall not be changed from day to day." *State v. Running Wolf*, 2020 MT 24, ¶ 21, 398 Mont. 403, 457 P.3d 218. Stare decisis is "a fundamental doctrine which reflects our concerns for stability, predictability and equal treatment[.]" *Formicove, Inc. v. Burlington Northern, Inc.*, 207 Mont. 189, 194, 673 P.2d 469, 472 (1983). Although it does not require that we follow a manifestly wrong decision, *Formicove, Inc.*, 207 Mont. at 194-95, 673 P.2d at 472, "[w]e decline to overrule a decision that has been in effect for over twenty years" and whose reasoning remains persuasive today. *State v. Demonity*, 2014 MT 66, ¶ 17, 374 Mont. 211, 324 P.3d 344. For 26 years, Article II, Section 10, of the Montana Constitution has fulfilled its promise of the "right to

---

[11] Montana 2024 election results, including the results for CI-128, available at: https://perma.cc/53NX-H4S3.

be let alone" by guaranteeing the people of Montana the right to a pre-viability abortion. *Armstrong*, ¶ 39; *Weems*, ¶ 37; *Planned Parenthood of Mont.*, 2024 MT 178, ¶ 22.

¶44 Under the legal landscape that existed when it was decided, *Armstrong* was not manifestly wrong. Given the robust protection of personal autonomy privacy by both legislative and judicial branches of government in the decades since, this Court concludes that its reasoning remains strong. We will not disturb that holding.

**Application of Montana Law to the Challenged Statutes**

¶45 "Statutes are presumed constitutional, and it is the duty of this Court to avoid an unconstitutional interpretation if possible." *Hernandez v. Bd. of Cnty. Comm'rs*, 2008 MT 251, ¶ 15, 345 Mont. 1, 189 P.3d 638. It is the challenging party's burden to prove that the statute is unconstitutional, and any doubt must be in favor of the statute. *Hernandez*, ¶ 15. Legislation that infringes on fundamental rights, however, is reviewed under a strict scrutiny standard, and it is the State's burden in those instances to demonstrate the legislation is narrowly tailored to achieve a compelling interest. *Planned Parenthood of Mont.*, 2024 MT 178, ¶ 16 (citing *Weems*, ¶ 34; *Armstrong*, ¶ 34). "While the analysis of a statute pertaining to fundamental rights will generally require a strict scrutiny review that ultimately shifts the burden, we still begin our review with the same principle: statutes are presumed to be constitutional." *Planned Parenthood of Mont.*, 2024 MT 178, ¶ 16 (quoting *Weems*, ¶ 34).

¶46 The State argues broadly that it is improper to impose the burden on the State to prove the existence of a problem as a prerequisite for exercising its police power. The State is correct that the right to privacy is not absolute. *Armstrong*, ¶ 38; *Goetz*, ¶ 26, (the

"right to privacy—even where established—is not absolute"); Conv. Tr., Vol. V, p. 1681 (The right to privacy "creates a semipermeable wall of separation between individual and state . . . . "[W]e all recognize that the state must come into our private lives at some point; but what it says is, don't come into our private lives unless you have a good reason for being there."). The State also is correct that it is within the Legislature's right and duty to enact laws. *Powder River Cnty. v. State*, 2002 MT 259, ¶ 115, 312 Mont. 198, 60 P.3d 357 ("It is the exclusive power of the Legislature to enact the laws of this state[.]").

¶47 When the State legislates in a way that infringes on a fundamental right protected by the Montana Constitution, however, its actions are subjected to higher scrutiny. It is the State's burden to show the laws are "justified by a compelling state interest" and are "narrowly tailored to effectuate only that compelling interest." *Gryczan*, 283 Mont. at 449, 942 P.2d at 122; *Robinson v. State Comp. Mut. Ins. Fund*, 2018 MT 259, ¶ 19, 393 Mont. 178, 430 P.3d 69; *Weems*, ¶ 41 ("The State has a police power by which it can regulate for the health and safety of its citizens. The question is not whether the Legislature has authority to act, but rather whether the Legislature's action is constitutional.").

¶48 We employ a three-step analysis to each of the challenged bills: (1) does the law infringe on a fundamental right to privacy; (2) does the State assert a compelling interest; and (3) if the State's interest is compelling, is the law narrowly tailored to achieve that interest? *Wiser v. State*, 2006 MT 20, ¶ 19, 331 Mont. 28, 129 P.3d 133. For step two, if the State enacts legislation that invades the right of a person to make medical judgments affecting their bodily integrity and health in partnership with a chosen health care provider or the right to seek and obtain pre-viability abortion services, the compelling interest must

30

be a medically acknowledged, bona fide health risk, shown by clear and compelling evidence. *Armstrong*, ¶ 59; *Cross v. State*, 2024 MT 303, ¶ 28, 419 Mont. 290, 560 P.3d 637; *Planned Parenthood of Mont.*, 2024 MT 178, ¶ 18. Under the relevant tiers of scrutiny, a legitimate interest (applied under rational basis review) is not a compelling one (applied under strict scrutiny). *Wiser*, ¶ 19. A compelling interest in this context is one of the highest order and not otherwise served. *Weems*, ¶ 44. For step three, a narrowly tailored law must effectuate only the asserted interest, *Armstrong*, ¶ 34, and be "the least onerous path" needed to achieve the state objective, *Weems*, ¶ 44 (quoting *Wadsworth*, 275 Mont. at 302, 911 P.2d at 1174). "A statute is not narrowly tailored if it is either underinclusive or overinclusive in scope." *Planned Parenthood of Mont.*, 2024 MT 178, ¶ 32 (citing *IMDb.com Inc. v Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020)).[12]

¶49    *1. Does a 20-week ban on abortions violate Montana's constitutional guarantees of individual privacy or equal protection?*

¶50    The District Court reasoned that HB 136 "regulates elective abortion without a basis in recognized medical risks." As to the State's interest of mitigating fetal pain, the court concluded the State failed to present sufficient evidence to establish clear and convincing proof of medical consensus of a bona fide health risk, and that the possibility of fetal pain alone does not create a health risk sufficient to justify intrusions on the right to privacy. Last, noting the overwhelming evidence that abortion is a medically safe procedure, the

---

[12] Far from affording an absolute right to abortion, Dissent, ¶ 157, this Court examines each challenge to determine whether the law meets these three factors. The expansive restrictions we have considered on appeal from final judgments have failed when there has been no showing of narrow tailoring to a medically acknowledged bona fide health risk. *Weems*, ¶ 51; *Planned Parenthood of Mont.*, 2024 MT 178, ¶ 56.

District Court concluded that the State failed to show how the outright ban was the least restrictive alternative in light of multiple other avenues by which the State could improve women's mental health.

¶51 On appeal, the State asserts a compelling interest in mitigating fetal pain and protecting women's health. It contends that HB 136 is narrowly tailored because it "prohibits only the most gruesome and destructive acts against fetal life; prevents [fetal pain] . . . at a gestational time when pain can be felt; and very narrowly impacts access to abortion by targeting a window of time in which few abortions occur."

¶52 PPMT counters that mitigating fetal pain is not recognized as a compelling interest under Montana law, the State conflates its evidence on stimuli response with fetal pain, and it fails to demonstrate that a 20-week ban is the least restrictive means to mitigate fetal pain to survive strict scrutiny. As to viability, PPMT asserts it is undisputed that 20 weeks is pre-viability, there is no medical consensus that gestational dating errs as the State asserts, and even crediting its arguments, 22 weeks is still pre-viability. Last, PPMT argues that abortion is safe, and the 20-week ban is not narrowly tailored to protect maternal health.

¶53 First, the law infringes on the right to privacy by prohibiting pre-viability abortions. PPMT provides abortions up to 21 weeks and 6 days. The record shows without material dispute that 20 weeks is pre-viability. This is consistent with current law, which presumes viability to begin at 24 weeks—four weeks after the 20-week restriction imposed by HB 136. Section 50-20-104(6)(b)(ii), MCA. Because the law prohibits abortions at a gestational age that is pre-viability, it infringes on the right to privacy to obtain a pre-

32

viability abortion and we apply strict scrutiny. The State must show both a bona fide health risk by clear and convincing evidence and that the law is narrowly tailored to address only that risk. *Weems*, ¶ 34; *Armstrong*, ¶ 34.

¶54 The State cites extensively in its briefing to mitigating fetal pain as a legitimate interest recognized by *Dobbs*. *Dobbs* recognized various legitimate interests when applying rational basis review to state abortion regulations under the U.S. Constitution. *Dobbs*, 594 U.S. at 301, 142 S. Ct. at 2284. This is not the standard we apply to the state constitutional issue presented in this case. *Planned Parenthood of Mont.*, 2024 MT 227, ¶ 21, 418 Mont. 226, 557 P.3d 471 (distinguishing the applicability of rational basis review under *Dobbs* and reaffirming that privacy right challenges under the Montana Constitution trigger strict scrutiny). Plaintiffs raise no challenge under the Fourteenth Amendment of the U.S. Constitution. *Dobbs* does not control here, nor does its standard of rational basis review. A legitimate interest is not sufficient; the State must a show a compelling interest—in this case, a medically acknowledged, bona fide health risk. *Armstrong*, ¶ 59.

¶55 We thus ask whether mitigating fetal pain is a compelling interest to justify banning a certain class of pre-viability abortions. Until viability, the bona fide health risk contemplated in *Armstrong* attaches to the mother—the paramount consideration is to her. *See Weems*, ¶ 45. Post-viability is when the State's interest in the preservation of fetal life may attach. The State does not direct its arguments to the post-viable period, and HB 136 undisputedly applies pre-viability, before that interest arises. Additionally, as discussed further below, the District Court was correct that, despite the State's assertions, the record shows there is *not medical consensus* that a fetus can experience pain at 20 weeks.

33

*See Armstrong*, ¶ 62 (the "legal standards for medical practice" must be "grounded in the methods and procedures of science and in the collective professional judgment, knowledge and experience of the medical community").  According to amici curiae thirteen national and local organizations representing physicians and other medical professionals, "[e]very major medical organization that has examined the issue has concluded, based on decades of peer-reviewed studies, that fetal pain perception is not anatomically possible before at least 24 weeks of gestational age."  The District Court was correct that the State failed "to show the 'collective professional judgment, knowledge and experience of the medical community' necessary to demonstrate" a compelling interest.  *Armstrong*, ¶ 62.

¶56     Most conclusive to our analysis, the law fails narrow tailoring.  The State has not shown that banning all abortions at 20 weeks is the least restrictive way to mitigate fetal pain, when its experts allege that a fetus can feel pain as early as 12 weeks.  Such an arbitrary threshold would be underinclusive and undermines the State's alleged interest.  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547, 113 S. Ct. 2217, 2234 (1993) ("It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (citations and internal quotations omitted).   When a law is underinclusive, it "diminish[es] the credibility of the government's rationale . . . in the first place."  *See City of Ladue v. Gilleo*, 512 U.S. 43, 52, 114 S. Ct. 2038, 2044 (1994).  As the District Court noted, "there is no evidence of any other pregnancy-related procedure that the State regulates based on" when a fetus can experience pain.

34

¶57 The State asserts an interest in protecting women's health and safety. It argues there are physical safety risks of abortion at later stages and that abortions lead to worse mental health outcomes. The State generally has a compelling interest in protecting patients' health and safety. *See Weems*, ¶ 38. Like in *Gryczan*, however, this compelling interest may fail when it rests "on faulty logic and invalid assumptions" and fails to establish a "clear relationship between the statute and any public health goals." *Gryczan*, 283 Mont. at 452-53, 942 P.2d at 123-24. The record shows that abortion is safe. As the District Court noted, there were zero deaths caused by abortion in Montana between 2010 and 2020, and only 25 of 8,402 (0.3%) reported abortions in Montana from 2016 to 2021 resulted in complications. The National Academies Study similarly concluded that "legal abortions in the United States—whether by medication, aspiration, [dilation and evacuation], or induction—are safe and effective." The study noted that even though the risk of serious complications increases with gestational age, serious complications are rare (occurring in fewer than one percent of abortions in the vast majority of studies and not exceeding five percent in any identified study). The American College of Obstetricians and Gynecologists also states that abortion is safe and major complications are rare. Because abortion is "safe and presents relatively minimal health risk," we can "dispose of any of the State's claimed compelling state interests which might be premised upon abortion care presenting a medically acknowledged, bona fide health risk." *Planned Parenthood of Mont.*, 2024 MT 178, ¶ 30; *Weems*, ¶ 48.

¶58 The State describes in detail the manner through which dilation and evacuation abortions are performed. This Court cannot find a bona fide health risk simply based on a

detailed step-by-step description of what the State defines as a "barbaric" and "gruesome" procedure when the overwhelming evidence shows that procedural abortions are safe. For the description of a medical procedure, without more, to constitute a bona fide health risk arguably would apply to myriad other medical procedures when defined in detail. Whatever may be the motivation behind them, *Armstrong* warned against laws that infringe on a "zone of individual privacy under the guise of protecting the patient's health" but lack clear and convincing evidence of a demonstrated connection. *See Armstrong*, ¶ 60. The State has not shown a medically acknowledged, bona fide health risk.

¶59 Additionally, the law is not narrowly tailored to the asserted interest of protecting women's mental health. Setting a bright-line ban on abortion is not the least restrictive means because, as the District Court noted, "there are myriad other avenues by which the State could improve mental health outcomes without altogether" banning pre-viability abortion. The law's over-inclusivity fails to account for the mental health consequences of being forced to carry to term an unwanted pregnancy. *Planned Parenthood of Mont.*, 2024 MT 178, ¶ 50 ("The consequences of not being able to terminate an unwanted pregnancy can be decidedly more traumatic and severe than for obtaining an abortion.").

¶60 The State asserts that poor mental health outcomes, when a patient chooses to have an abortion, are one of the adverse effects it is trying to protect against, yet HB 136 excludes psychological and emotional impacts as a basis for permitting abortion past 20 weeks. Sections 50-20-602(9), -603(1)(a), MCA (2021).[13] This suggests that a person's

---

[13] All further references in this Opinion are to the 2021 version of the Montana Code Annotated unless otherwise noted.

mental health matters to the State only to prevent abortion, not as a valid reason to obtain one. *See Planned Parenthood of Mont.*, 2024 MT 178, ¶ 42 (reasoning the disputed law failed narrow tailoring when it singles out abortion relative to other types of health care, including pregnancy-related care).

¶61 Nor can we accept the State's argument that the law is narrowly tailored because it forecloses only about ten abortions a year. Article 10, Section II, of the Montana Constitution protects each *individual's* right to privacy. The State cites no case law, and this Court does not accept, that simply because fewer people's fundamental rights are violated, it is somehow less restrictive. A law infringing any person's fundamental right to privacy triggers the same scrutiny.

**Dispute of Material Facts**

¶62 The State challenges the entry of summary judgment, alleging that there are material facts in dispute regarding all three bills. We address the State's material facts arguments separately under our discussion of each bill. The District Court granted PPMT summary judgment, and we thus analyze PPMT's motion as the prevailing, moving party. *Sands*, ¶ 17 (citing *Hajenga*, ¶ 18).

¶63 For its ruling on HB 136, the District Court reasoned that, under current medical science, it is undisputed that no fetus is viable at 20 weeks; it found that no fetus born in Montana on record has survived at 22 weeks or earlier. The court further reasoned that "a bright-line ban approaching the point of viability would likely infringe the rights of some patients whose gestational length has been overestimated," and "any attempts by the State to regulate abortion by defining viability in terms of gestational age alone should be

37

constitutionally suspect." The court thus concluded that given "the undisputed facts surrounding current medical science and the inherently case-by-case nature of viability," HB 136's 20-week limit on abortion infringes the right to privacy, "as would any law set out that way."

¶64 The State first argues that "material disputes regarding whether HB 136 affects pre-viability abortions exist" because the estimation of gestational age may be off by one to two weeks. Thus, the State asserts that permitting abortions beyond 20 weeks presents a bona fide health risk that abortions may occur when the fetus was viable. Second, the State asserts there are material facts in dispute regarding the developmental stage at which a fetus can feel pain.

¶65 The party moving for summary judgment has "the initial burden of establishing the absence of a genuine issue of material fact and entitlement to judgment as a matter of law[.]" *Meloy v. Speedy Auto Glass, Inc.*, 2008 MT 122, ¶ 18, 342 Mont. 530, 182 P.3d 741. Once it meets this burden, "the burden shifts to the nonmoving party to establish with substantial evidence, as opposed to mere denial, speculation, or conclusory assertions, that a genuine issue of material fact does exist or that the moving party is not entitled to judgment as a matter of law." *Meloy*, ¶ 18. Here, PPMT has shown that HB 136 infringes the privacy right of procreative autonomy. It is the State's burden to show a genuine issue of material fact.

¶66 Mere disagreement about facts does not preclude summary judgment. The "factual dispute must be material to preclude summary judgment." *Fabich v. PPL Montana, LLC*, 2007 MT 258, ¶ 44, 339 Mont. 289, 170 P.3d 943. "Material issues of fact are identified

38

by looking to the substantive law governing the proceedings." *DeVoe v. State*, 281 Mont. 356, 366, 935 P.2d 256, 263 (1997) (citing *Carelli v. Hall*, 279 Mont. 202, 207, 926 P.2d 756, 760 (1996)). Here, the substantive law requires the State to establish by clear and convincing evidence a medically acknowledged bona fide health risk.

¶67 We first address the State's arguments surrounding viability and potential errors in gestational age. The State's experts testified that while viability used to be 24 to 26 weeks, viability has now decreased. Despite the 24-week statutory presumption, two of the State's experts considered viability to be 22 to 23 weeks (with one expert stating there had been a baby who survived at 21 weeks and one day), while one considered the margin to be 22 to 24 weeks. The State's experts agreed that viability depends on various factors, it is a moving line, and medical professionals must "take care of each individual as they present." The State's expert testimony further conceded that 20 weeks is generally pre-viability. PPMT asserts that viability depends on various factors but that 20 weeks is undisputedly pre-viability. A bright-line ban at 20 weeks would prohibit pre-viability abortions, even with potential inaccuracies for gestational dating. The testimony that the State highlights to support its assertion that there are inaccuracies with gestational age dating simply states that there may be inaccuracies as gestational age increases. PPMT experts state that even at 20 weeks, the margin of error is only one to one-and-a-half weeks. Even construing this evidence in the light most favorable to the State, the speculative nature that gestational age could be off by one or two weeks, or that advancements in medical science increase the odds of unborn children surviving outside the womb at younger gestational age, does not rise to the level of substantial evidence needed to demonstrate any risk of abortion of viable

39

fetuses. *Rich*, ¶ 12 (reasoning the speculative arguments do not raise genuine issues of material fact).

¶68 As discussed earlier, the State's argument is self-defeating. It emphasizes uncertainty in viability and gestational age dating, while at the same time advocating for a bright-line ban at a gestational age that its own experts concede includes pre-viability abortions. The State's experts testified that viability is a case-by-case determination depending on individual needs. A bright-line ban that does not allow individual assessment and that undisputedly includes pre-viability abortions is not legally or medically justified. A viability determination is part of the doctor-patient relationship where each patient's condition and circumstances may be evaluated and the patient is able, with the help of her chosen medical provider, to make medical judgments "affecting her or his bodily integrity and health . . . free from the interference of the government." *Armstrong*, ¶ 75. Because viability is part of the doctor-patient relationship, and 20 weeks is undisputedly pre-viability, the State's alleged arguments on errors in gestational age dating are both immaterial and speculative.

¶69 Second, the State argues there are material facts in dispute related to a fetus's ability to feel pain. The State's experts testified in depositions that a fetus can feel pain as early as 12 weeks and that anesthesia or analgesia is administered during surgery, in part to suppress a fetus's stress response. One of the State's experts acknowledged, however, that the "consensus cutoff is 24 weeks," and another testified they were aware these views were inconsistent with the American College of Obstetricians and Gynecologists and the Royal College of Obstetricians and Gynecologists. PPMT asserts that a stress response is an

automatic physiological process which is not the same thing as an ability to feel pain. PPMT witnesses and experts testified in their depositions that the overwhelming literature suggests that "if pain were going to be possible, it would not be possible until 24 weeks" because key connections to the brain do not develop before that time.

¶70 Generally, conflicting expert testimony creates a dispute of fact, but the fact in dispute must be material. *Wood v. Old Trapper Taxi*, 286 Mont. 18, 27, 952 P.3d 1375, 1381 (1997). A fact is material if it is outcome-determinative. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). The State's arguments fail because this dispute is not material. Even if we were to assume a compelling interest in mitigating fetal pain, the State's evidence would not be outcome-determinative because—as discussed above—it failed to show that a 20-week abortion ban is the least restrictive way to achieve its interest. The State's experts acknowledged that their views that a fetus could feel pain as early as twelve weeks were inconsistent with the "consensus cutoff" and with the conclusions of the American College of Obstetricians and Gynecologists and the Royal College of Obstetricians and Gynecologists. "A statute is not narrowly tailored if it is either underinclusive or overinclusive in scope." *Planned Parenthood of Mont.*, 2024 MT 178, ¶ 32. Taken as a whole, the State's expert testimony established that the 20-week abortion ban was, at a minimum, underinclusive while also acknowledging it was potentially overinclusive. In either case, the State failed to present a disputed material fact that the statute was narrowly tailored to address mitigation of fetal pain.

41

¶71 Even accepting the credibility of all the State's witnesses, the State's evidence could not supply clear and convincing proof of a bona fide health risk determined by the medical community that HB 136 would alleviate. *Armstrong*, ¶ 62. It fails to meet the standard of the "collective professional judgment, knowledge and experience of the medical community" by clear and convincing evidence. *Armstrong*, ¶¶ 59, 62. It also fails to demonstrate that its proposed method of vindicating its asserted interests is narrowly tailored to those interests. *Weems*, ¶¶ 44-45. The District Court did not err in granting summary judgment that HB 136 violates Montana's constitutional right to individual privacy.

**Equal Protection Claim**

¶72 Finally, citing *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, 325 Mont. 148, 104 P.3d 445, the District Court concluded that HB 136 violates the equal protection clause under Article II, Section 4, of the Montana Constitution because "it wrongly creates legal classifications based on the exercise of a fundamental right."

¶73 Article II, Section 4, of the Montana Constitution guarantees that "[n]o person shall be denied equal protection of the laws." Our equal protection clause guarantees more individual protection than does the Fourteenth Amendment of the U.S. Constitution. *Snetsinger*, ¶ 15. "When analyzing an equal protection claim, the Court follows a three-step process: (1) identify the classes involved and determine if they are similarly situated; (2) determine the appropriate level of scrutiny to apply to the challenged legislation; and (3) apply the appropriate level of scrutiny to the challenged statute."

*Planned Parenthood of Mont.*, 2024 MT 178, ¶ 26 (quoting *Goble v. Mont. State Fund*, 2014 MT 99, ¶ 28, 374 Mont. 453, 325 P.3d 1211).

¶74 The classes involved here are women exercising their right to a pre-viability abortion before and after 20 weeks' gestational age. The classes are similarly situated because both comprise pregnant women seeking the same reproductive health care before the fetus is viable. "Strict scrutiny applies if a suspect class *or fundamental right* is affected." *Snetsinger*, ¶ 17 (emphasis added) (citing *McDermott v. Mont. Dept. of Corrections,* 2001 MT 134, ¶ 31, 305 Mont. 462, 29 P.3d 992). HB 136 creates a legal classification based on the exercise of the fundamental right to a pre-viability abortion in consultation with the patient's chosen medical provider. As such, the law must pass strict scrutiny. *Planned Parenthood of Mont.*, 2024 MT 178, ¶ 29. This applies even when the underlying classification itself is not suspect. *Planned Parenthood of Mont.*, 2024 MT 178, ¶ 64 (Rice, J., concurring). Because it is the same strict scrutiny standard applied above, our analysis also is the same. HB 136 consequently also violates Article II, Section 4, of the Montana Constitution.

¶75 *2. Do restrictions on medication abortions and requirements that providers give patients certain information violate Montana's constitutional guarantees of individual privacy and free speech?*

¶76 The District Court concluded that HB 171 is unconstitutional because it "violates the right to privacy by imposing numerous and severe burdens on patients and providers" without showing a bona fide health risk. The court reasoned that these "restrictions effectively ban an entire method of treatment which otherwise serves a critical gap in care, under the guise of protecting the very patients whose rights they undermine."

43

¶77 On appeal, the State argues that HB 171's requirements for mifepristone distribution are "little more" than what the U.S. FDA requires; that medication abortions always involve a significant risk of serious complications; that the law serves to prevent coercion and that it minimizes interference with a pregnant mother's rights while "promoting respect for and maximizing opportunities to preserve unborn life." Additionally, the State contends that the Legislature "rationally acted" to ensure women know about abortion reversal, and the credentialing and reporting requirements are similar to what providers already do.

¶78 The legislative purpose of HB 171 lists protecting the health and safety of women, ensuring informed consent, ensuring medication abortions are not administered to someone who has already miscarried, and ensuring that medication abortions are not prescribed after 70 days from the last menstrual period. Section 50-20-702, MCA. Because HB 171 has various separate sections, we analyze the sections separately (as the District Court also did). We employ the same three-step analysis: (1) does the law infringe on a fundamental right to privacy; (2) does the State assert a compelling interest; and (3) if yes, is the law narrowly tailored? *Wiser*, ¶ 19.

**Telehealth Ban, 24-Hour Waiting Period, and Multiple Visits**

¶79 HB 171 bans direct-to-patient telehealth medication abortions, which allow a patient to receive medication abortions through the mail after meeting with a provider via a secure video telehealth platform to determine their eligibility. Section 50-20-704, MCA. Instead, it requires multiple in-person visits: one initial visit, followed by a 24-hour wait after signing a state-mandated consent form (discussed below); then the patient must return to

44

receive the medication abortion in-person; and then the provider must schedule an in-person follow-up. Sections 50-20-704, -705, -707, -708, MCA. The mandatory 24-hour waiting period between the consent form and receiving treatment is subject to narrow exceptions, explicitly excluding psychological or emotional conditions.

¶80 PPMT provides medication abortions to patients via three ways: (1) in person at the health center; (2) site-to-site where a patient at one PPMT center connects via teleconference to a provider at a different center; and (3) direct-to-patient (commonly referred to as telehealth medication abortions). From July 2020 through June 2021, 76 percent of the medication abortions provided were through site-to-site or direct-to-patient. Montana has only seven facilities that provide abortions—limited to five urban areas. PPMT has five health centers—two in Billings and one each in Helena, Missoula, and Great Falls. The District Court took judicial notice that the state covers 147,040 square miles, and each facility must cover an average of 21,006 square miles (or 145 miles on each side). Further, though only two of PPMT's health centers provide procedural abortions, all PPMT health centers offer medication abortions. The court's reasoning substantiates that the facilities are not evenly located but are concentrated in urban areas, thus exacerbating the disparities and requiring some patients to travel several hours for care. Deposition testimony showed that telehealth medication abortions offer an option to patients who live hours from the clinics, have jobs, childcare responsibilities, or physical disabilities, and who are otherwise unable to reach the clinic, but the waiting periods and in-person requirements all make it more difficult for people to access abortion care.

¶81 Under step one, the law infringes on the fundamental right to a pre-viability abortion because it impacts how and when a patient can get a pre-viability abortion. *Armstrong*, ¶¶ 58, 65 (infringement occurs when the State "dictates how and by whom a specific medical procedure is to be performed" or "attempt[s] to make it as difficult, as inconvenient and as costly as possible"); *see also Weems*, ¶ 43. This does not set a new standard protecting "the ease" of obtaining an abortion, Dissent, ¶ 164, but is grounded in our holdings in *Armstrong* and *Weems*. The Legislature has latitude to regulate how and when a patient gets an abortion *if* it is narrowly tailored to advance a compelling interest. Before asking that question, we consider whether a challenged law infringes the privacy right in the first place. In this case, the law completely bans one form of pre-viability abortion (telehealth medication abortions) and makes it more difficult and costly to obtain an in-person medication abortion by requiring multiple in-person visits and a 24-hour waiting period. Medication abortions are administered only up to eleven weeks from the first day of the last menstrual period; HB 171 thus exclusively deals with pre-viability abortions. By prohibiting one form of pre-viability abortion and making another more difficult to obtain, the State infringes on a fundamental privacy right.

¶82 We thus look to whether the State has shown a "medically[]acknowledged, bona fide health risk, clearly and convincingly demonstrated" to justify this intrusion. *Armstrong*, ¶ 62. The State alleges that the 24-hour waiting period under HB 171 reflects the State's interest in preserving unborn life. This is not a recognized compelling interest that the State can assert pre-viability to support HB 171. The State must show that there are "exacerbated health risks" when telehealth medication abortions are provided. *Weems*,

46

¶ 45. The State has not done so. The Dissent suggests that routinely scheduled surgeries and other outpatient procedures often require two separate visits. Dissent, ¶ 165. But it points to no other example of a state statute mandating a specific healthcare procedure in such a detailed fashion instead of allowing medical professionals to determine the needs and make assessments of their own patients based on their professional knowledge of and expertise in the procedure the patient will be undergoing and the risks it entails.

¶83 PPMT presented evidence that telehealth medication abortions are safe, acceptable, effective, and improve access to care. The National Academies Study reported that telehealth medication abortions do not pose a significantly higher prevalence of adverse events compared with in-person provision of medication abortions, and overall present a very low risk of adverse events (similar to over-the-counter medications).[14] The State's own authority on FDA regulations shows that the FDA currently allows telehealth medication abortions, thus defeating its argument that the restrictions are comparable to FDA regulations.[15] The State additionally argues that the FDA authorizes medication abortions only up to 70 days gestation, but it provides no evidence that providing medication abortions up to 77 days presents a health risk. More importantly, the State fails

---

[14] The State argues in briefing that mifepristone can "cause potentially lethal hemorrhage and sepsis[.]" Its brief in the District Court cites to the National Academies Study. The cited section discussing complications concluded that such complications are rare and occur "in no more than a fraction of a percent of patients."

[15] The State, citing *All. For Hippocratic Med. v. FDA*, No. 23-10362, 2023 WL 2913725 at *2 (5th Cir. 2023), argues that the FDA requires in-person office visits. As PPMT points out, the case and its subsequent history show that the FDA regulations that allow telehealth medication abortions remain in effect. *See FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 374, 376-78, 144 S. Ct. 1540, 1552-54 (2024).

to show how a complete ban on telehealth medication abortions would justify this concern. It certainly is not the "least onerous path[.]" *Weems*, ¶ 44.

¶84 The State cites the need for an in-person follow-up to ensure women are not experiencing complications. PPMT's current procedure includes a telehealth visit to ensure the patient is eligible for a telehealth medication abortion and there are no contraindications (such as risk factors for an abnormal pregnancy); as well as post-care options including a 24/7 telephone hotline the patient can call and different follow-up protocols "depending on what is medically indicated" based on the treating provider's judgment. This, in addition to the earlier referenced studies that there have been zero deaths caused by abortion in Montana between 2010 and 2020 and the low rate of complications, means the State has not "clearly and convincingly" demonstrated a bona fide health risk that a mandatory in-person follow-up appointment for telehealth medication abortions would alleviate. Instead, it unlawfully substitutes the government's judgment for that of the medical community and the individual's private, autonomous decision-making about their health matters. *See Armstrong*, ¶ 62.

¶85 The State purports to ban telehealth medication abortions to protect patient safety, but in its defense of HB 136 (the 20-week ban), cites the risk of more complications in later term abortions as a reason to ban abortions at 20 weeks. The record demonstrates that compliance with the 24-hour wait period, the multiple in-person visits, and the telehealth ban serve only to delay access to abortion care—thus increasing the odds that the patient will not be able to obtain an abortion or increasing the odds of the very complications the State asserts it wishes to protect against. This disparity is further exacerbated by the fact

that all PPMT centers offer medication abortions, while only two offer procedural abortions. This "faulty logic" defeats a showing that the law is narrowly tailored to the compelling interest of a bona fide health risk. *See Gryczan*, 283 Mont. at 452–53, 942 P.2d 123–24 (rejecting the State's alleged interest of protecting public health when it rested on faulty logic and invalid assumptions); *see also Planned Parenthood of Mont.*, 2024 MT 178, ¶ 37 (citing *Weems*, ¶ 43) (reasoning the State has not shown a bona fide health risk when "the evidence overwhelmingly demonstrated delaying access to abortion care . . . increases the risk of abortion care and could foreclose the option of obtaining an abortion altogether").

¶86    The State asserts a compelling interest in preventing coerced abortions. To support this assertion, the State points to deposition testimony that although providers make the best effort to ensure video conferencing, sometimes the calls happen via phone, and that providers "rely on a number of things to assess whether a patient is alone and safe," among which is trusting the patient's statement that they are alone in the room. The record shows that PPMT follows evidence-based, established protocols for offering telemedicine-based medical services; part of those protocols ensure patients are not being coerced or pressured; and the clinicians at PPMT go through extensive training regarding reproductive coercion, which includes how to talk about the issue with patients but also how to look for signs that would indicate coercion. That telehealth appointments may occur sometimes off-camera does not automatically mean coercion is occurring. The record does not show any evidence, much less clear and compelling evidence, of a risk of coerced abortions. This does not constitute the clear and compelling evidence of a required bona fide health risk.

49

¶87 Even if the State had provided evidence on the point, completely banning telehealth medication abortions, requiring multiple mandatory in-person visits, and imposing a 24-hour wait period are not the least restrictive means to reduce any risk of coercion. The State does not reconcile its position with the evidence highlighted by amici that survivors of domestic violence may be forced to carry through with their pregnancies to entrap them in the relationship—a different form of coercion. Deposition testimony showed that an abortion ban would force people to "remain pregnant against their will" and that abortion care providers frequently treat patients dealing with intimate partner violence.[16] The State has not shown there is a bona fide health risk to telehealth medication abortions to justify banning them altogether, requiring in-person visits, or mandating a 24-hour delay. Even if the State could show coercion as a bona fide health risk, the interests it asserts are not narrowly tailored to address only those interests. *Gryczan*, 283 Mont. at 449, 942 P.2d at 122. These requirements only make obtaining abortion care more difficult, more inconvenient, and more costly, without a showing that they protect women's health. *Weems*, ¶ 37 (citing *Armstrong*, ¶ 65) (quotations omitted).

**Consent Form**

¶88 HB 171 also creates a mandatory informed consent form the provider must fill out and sign with the patient. Section 50-20-707(1), MCA. The form requires the patient's and provider's signatures, line item initials by the patient, and at least 20 criteria on the

---

[16] Amici curiae organizations dedicated to serving survivors of intimate partner violence (IPV), also point out that women in Montana suffer IPV at higher rates than the national average and that Indigenous women in Montana often live on tribal lands and farther from health centers, thus exacerbating disparities in access to health care.

form.  Section 50-20-707(4), MCA.  These criteria include the following declarations: an understanding that the "abortion-inducing drug will result in the death of the unborn child[,]" a list of risks including "hemorrhage, failure to remove all tissue of the unborn child, which may require an additional procedure, sepsis, sterility, and possible continuation of pregnancy[,]" "initial studies" on the possibility of abortion reversal, and "information on the potential ability of qualified medical professionals to reverse the effects" of abortion and contact information (including a website and phone number).  Section 50-20-707(5), MCA.  It requires DPHHS to prepare forms on abortion reversal and the provider to give the patient these state-prepared materials.  Section 50-20-708, MCA.

¶89    First, we identify whether the law infringes on a privacy right.  *Wiser*, ¶ 15.  *Armstrong* guarantees that an individual may make medical judgments with their healthcare provider free from government interference.  *Armstrong*, ¶ 14.  As discussed further below, the law mandates that providers tell patients information against their own medical judgment when discussing medication abortions (which are undisputedly administered pre-viability).  Although HB 171 does not outright ban any form of abortion or impose onerous in-person requirements, it infringes on the fundamental right to privacy because it conditions a person's ability to obtain a pre-viability abortion on receiving information against a medical provider's judgment and inserts the State's voice into an individual's medical decisions with their healthcare provider.  When state regulation infringes on the right to privacy, as is the case here, it "must be based on protecting citizens from actual health risks."  *Planned Parenthood of Mont.*, 2024 MT 178, ¶ 22 (citing *Weems*, ¶ 37; *Armstrong*, ¶¶ 58-59).  Because it intrudes on the personal autonomy privacy

51

right in healthcare decisions, we turn to whether the State has shown a medically acknowledged, bona fide health risk.

¶90 The State asserts that HB 171 furthers the compelling interest of ensuring informed consent. This Court recognizes that the Legislature has enacted laws to promote informed consent in the medical field. For example, § 50-12-105, MCA, requires written informed consent when a patient is seeking treatment for a chronic or terminal illness from an investigational drug. This statutory example is markedly different from the informed consent statutes at issue. It does not provide specific mandates about what advice the provider must include. It instead is "based on the treating health care provider's knowledge of the proposed treatment in conjunction with an awareness of the patient's condition." Section 50-12-105(3)(b), MCA. As recognized in medical malpractice cases, the "disclosures required to obtain an informed consent are a matter of medical judgment." *Howard v. Replogle*, 2019 MT 244, ¶ 17, 397 Mont. 379, 450 P.3d 866 (citing *Collins v. Itoh*, 160 Mont. 461, 467-68, 503 P.2d 36, 40 (1972)). The treatment decisions a patient makes contemplate "individualized care tailored to the needs of each patient based on the exercise of professional medical judgment and informed consent." *Cross*, ¶ 37.

¶91 In deposition testimony from the Attorney General's M. R. Civ. P. 30(b)(6) designee, the office stated that it did not possess any evidence that patients in Montana are not provided informed consent to abortions. The record establishes that PPMT has a robust informed consent process to make sure the patient understands what an abortion entails, assess the patient's decision around abortion, discuss alternatives to abortion, risks, benefits, and additional support needs, screen for coercion or uncertainty, and ensure that

patients are confident in their decisions—like providers do for other medical interventions. This process includes educational materials, printed forms, and conversations between the patient and provider, which include questioning, counseling, and risk assessment. The conversation is not based on one specific question but counseling and additional questions tailored to the patient's responses. The District Court correctly reasoned that there is no evidence that "patients seeking medication abortions are unable to provide informed consent." The State has not established a bona fide health risk that the mandated consent forms would alleviate.

¶92 Even if the State could show by clear and compelling evidence that informed consent is not already provided by treating medical professionals, the State has not shown how the form is narrowly tailored to achieve *only* the furtherance of informed consent. *Gryczan*, 283 Mont. at 449, 942 P.2d at 122. The bill mandates that patients be told about abortion reversal, which is the theory that once a person begins a medication abortion, they potentially can reverse it by taking progesterone. The District Court reasoned that the record does not show abortion reversal is even possible because the evidence on reversibility is limited to a halted trial, "an article that the State's expert cites but did not read," and a non-randomized case series. The record shows that the State's expert, Dr. Ingrid Skop, conceded that the case series could not demonstrate that an intervention (here, high levels of progesterone) caused a particular outcome (reversing a medication abortion).

¶93 Dr. Dickman testified that he would never provide information about abortion reversal because it has not been shown to be safe and effective, and discussing safe and effective care options is critical. Dr. McNicholas testified the data suggests abortion

reversal is not safe and effective but also creates serious concerns about the patient's ability to engage in the informed consent process. She testified that PPMT makes all efforts to ensure people have made a solid decision at the time they initiate the abortion. To suggest that the patient can reverse the abortion undermines the informed consent process, which works to bring about a high degree of certainty in a patient's decision to have an abortion. It undermines informed consent if a patient initiates the procedures under the false belief that they may be able to reverse the abortion later. The National Academies Study similarly stated there is not reliable evidence or sufficient data to conclude that progesterone treatment is effective.

¶94　The form mandates that patients be told about a list of "complications" with medication abortions—including, for example, breast cancer, which the State's own experts acknowledge is not a risk with medication abortions. The National Academies Study stated that "legally requiring providers to inform women about risks that are not supported and even invalidated by scientific research violates informed consent." It further concluded that informing patients that abortion increases the risk of breast cancer, mental health disorders, difficulties in having a successful pregnancy, or the possibility of abortion reversal "is not supported by research that meets scientific standards."

¶95　The State's mandated language that the procedure "ends in the death of the unborn child" substitutes the government's determination about what abortion means for an individualized assessment by the medical professional and the patient. Just as "consenting adults expect that neither the [S]tate nor their neighbors will be co-habitants of their bedrooms[,]" medical patients also expect that the State will not be a co-participant in their

54

private conversations with their doctors absent a clearly demonstrated, compelling interest. *Gryczan v. State*, 283 Mont. at 450, 942 P.2d at 122; *accord Armstrong*, ¶ 59 (reasoning that absent a bona fide health risk, the Legislature does not have a "legitimate presence nor voice in the patient/health care provider relationship").

¶96    There is a difference between the State simply requiring that a conversation happen to ensure informed consent based upon "the education, training, experience, advice, and professional integrity of the health care provider" and the State dictating what must be said in that conversation. *Armstrong*, ¶ 58. The District Court correctly reasoned that "[c]onstruing [this] evidence in the light most favorable to the State, it is clear that no medical consensus exists to justify invading the patient-provider relationship in this way with forced, unsubstantiated medical advice." The requirements of the informed consent form thus unconstitutionally infringe the right to privacy.

**Free Speech Claim**

¶97    Article II, Section 7, of the Montana Constitution states: "No law shall be passed impairing freedom of speech or expression." "[T]he government may not regulate speech based on its substantive content or the message it conveys." *Denke v. Shoemaker*, 2008 MT 418, ¶ 47, 347 Mont. 322, 198 P.3d 284 (citation omitted); *Griffith v. Butte Sch. Dist. No. 1*, 2010 MT 246, ¶ 46, 358 Mont. 193, 244 P.3d 321. A law is content-based if "the law on its face[] draws distinctions based on the message a speaker conveys, such as the topic discussed or the idea or message expressed." *State v. Lamoureux*, 2021 MT 94, ¶ 21, 404 Mont. 61, 485 P.3d 192 (citations and internal quotations omitted). Such laws are presumptively invalid. *Lamoureux*, ¶ 21. Viewpoint discrimination is "an egregious form

of content discrimination" and occurs when the "government, in the realm of private speech and expression, favor[s] one speaker over another." *Denke*, ¶ 47 (citation omitted); *accord Griffith*, ¶ 46. "[T]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Denke*, ¶ 47 (citations and internal quotations omitted). Relying on *Denke*, the District Court concluded that HB 171 constituted impermissible content-based restriction and viewpoint discrimination.

¶98    The statute at issue here does not necessarily prohibit a provider's speech; compelled speech, though, also is protected by free speech principles. "[T]he choice to speak includes within it the choice of what not to say." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16, 106 S. Ct. 903, 912 (1986). Forcing medical providers to give medical advice that they disagree with—like the safety and efficacy of abortion reversal—is a form of compelled speech triggering protections under Article II, Section 7, of the Montana Constitution.

¶99    PPMT asserts that patients may mistakenly understand the consent form to indicate DPHHS's and their provider's approval of abortion reversal. In deposition testimony, DPHHS acknowledged that it did not verify the accuracy of the website's contents. The regulations at issue control what the providers say (thus indicating content-based restrictions), but more egregiously favor one viewpoint over another—namely, the viewpoint that abortion reversal is safe and possible over the judgments and viewpoints of providers that it is unsafe, ineffective, and undermines informed consent.

¶100 The District Court correctly pointed out that the statute is "conspicuously absent of any requirement that providers discuss the potential risk of carrying a pregnancy to term." Additionally, the regulation would apply only to health centers that provide medication abortions, thus further implicating the State's favoring of one speaker over the other. *See Denke*, ¶ 47. This is viewpoint discrimination by the State. The efficacy of abortion reversal is controverted within the scientific community. Because the statute constitutes impermissible viewpoint discrimination, it is subject to strict scrutiny. *See Denke*, ¶ 47. The Dissent, ¶ 166, inaccurately states that "HB 171 does not require providers to give medical advice that they disagree with." We highlighted above the deposition testimony that the provider would "never provide information about abortion reversal." The Dissent posits, though, that the provider could just include additional information to reflect their own judgments. Dissent, ¶ 166. But forcing providers to give controversial medical advice against their judgment (and that of the medical community) or to resort to giving potentially conflicting information to their patients denies providers the "choice of what not to say[,[" *Pac. Gas & Elec. Co.*, 475 U.S. at 16, 106 S. Ct. at 912, and is not the least restrictive way for the State to advance its asserted goals.

**Credentialing Requirements**

¶101 The law further requires that the provider possess a broad set of credentials (or have a signed contract with a credentialed provider) and be able to handle a list of 29 enumerated complications, including renal failure, metabolic disorder, subsequent development of

breast cancer, coma, as well as "any other adverse event." Sections 50-20-703(5), -705(2), MCA.

¶102 Analogizing to *Weems*, the District Court reasoned that the law requires "such extensive credentialling that" medication abortions would be "abolished by impracticality." On appeal, the State asserts that HB 171 advances maternal health and the integrity of the medical profession by ensuring that practitioners are competent to address complications that may result.[17]

¶103 We agree that *Weems* is on point. The statute we considered in that case prevented advanced practice registered nurses (APRNs) from performing abortions. *Weems*, ¶ 1. This Court acknowledged the State's police power to regulate for the health and safety of its citizens and reasoned that the "Legislature does not lose its authority to legislate in areas that have been delegated to the oversight of a board." *Weems*, ¶ 40. Ultimately, the statutes at issue in *Weems* were unconstitutional because, despite the Legislature's police power, the statute "precluded qualified health care providers from performing abortion care" (thus

---

[17] The State asserts that material facts remain in dispute because the District Court order overstated the credentialing requirements of HB 171, which, according to the State, "merely requires abortion providers to be competent to handle complications themselves or have an arrangement with an associated medical provider who can." The State goes on to acknowledge that some of the listed complications "may manifest months or years after an abortion and may be treated by another competent provider." Interpretation of statutory language is a question of law, not fact. *Rairdan v. State*, 2021 MT 247, ¶ 6, 405 Mont. 467, 495 P.3d 1050. HB 171 clearly requires that the abortion provider is credentialed and competent to handle complications or has a "signed contract with an associated medical practitioner who is credentialed to handle complications"[;] that the provider give the contact information of the associated medical practitioner to the patient; and that the provider be able to produce the signed contract on demand by the patient or department. Section 50-20-705(2), MCA. HB 171 defines complications as 29 potential events and "any other adverse event." Section 50-20-703(5), MCA. We review for correctness the District Court's interpretation of HB 171's credentialing requirements, which is a question of law. *Rairdan*, ¶ 6.

infringing on the fundamental right to privacy), and the State failed to demonstrate that permitting APRNs to provide abortions presented a medically acknowledged, bona fide health risk. *Weems*, ¶¶ 43, 51.

¶104 Under step one, HB 171's credentialing requirements infringe on the right to privacy because the requirements dictate who can provide a pre-viability medication abortion. The State's expert conceded in deposition testimony that there is "no way any physician in the universe can manage every one of those complications by themselves." Because the law affects only pre-viability abortions (PPMT only provides medication abortions up to 11 weeks) and "preclude[s] qualified health care providers from performing abortion care," it infringes on the fundamental right of procreative autonomy protected by the right to privacy. *Weems*, ¶ 43.

¶105 Under step two in our analysis, PPMT also is correct that the State has not shown a bona fide health risk in the current credentialing requirements. The State acknowledged on appeal that PPMT *already* ensures that their providers can provide surgical interventions in cases of incomplete abortion or severe bleeding or have made plans to ensure patient access to care through other medical facilities.

¶106 As we reasoned in *Weems*:

> [L]imiting the pool of qualified abortion providers would significantly interfere with a patient's right of privacy because of significant cost and travel required to access a provider. The scarcity of providers in Montana increases the likelihood patients will experience delays accessing care, forcing them to remain pregnant until they can seek a later-term abortion, which can result in comparatively higher risk, greater expenses, and even ineligibility for medication abortion as pregnancy advances.

*Weems*, ¶ 50. The State's own arguments show that the credentialing requirements do not appear to achieve any interest not already served by PPMT procedures but instead "preclude qualified health care providers" from providing medication abortions and thus fail strict scrutiny. *Weems*, ¶ 43.

**Reporting requirements**

¶107 Finally, HB 171 imposes various reporting requirements to DPHHS, including the identification of the provider who provided the medication abortion, the patient's county of residence, age, race, and number of previous pregnancies, number of live births, and number of previous abortions of the pregnant women. Section 50-20-709, MCA.

¶108 The District Court reasoned the reporting requirements appear to serve no government purpose and do not mitigate a bona fide health risk. DPHHS provided deposition testimony that it already collects data related to abortions in Montana and had no evidence that the additional information required by HB 171 would be necessary to promote the health and safety of women by adding to the sum of medical and public health knowledge.

¶109 The State disputes that HB 171 "creates a new privacy concern[.]"[18] It argues that DPHHS does not provide individual data to other entities and PPMT already collects and reports "patient data to DPHHS, including the name of the patient and provider and the date of abortion."

_____

[18] The State argues that whether it creates a new privacy concern is a disputed material fact. "The constitutionality of a statute is a question of law" that we review for correctness. *Williams*, ¶ 23.

¶110 It is undisputed that HB 171 imposes additional reporting requirements. The record shows that the current practice is for PPMT to report data to DPHHS, including patient and provider information and names, the type of abortion, and complications. From these forms, the State reports only aggregate data on abortion care. The State's general argument that PPMT already complies with certain reporting requirements does not address the concern that the statute now would authorize the non-aggregated demographic information to be subject to public disclosure, § 50-20-709(8), MCA, which creates new privacy concerns.

¶111 "[P]rivacy interests concerning a person's medical information implicate Article II, Section 10, of the Montana Constitution[.]" *Wenger*, ¶ 28 (quoting *Robinson v. State Comp. Mut. Ins. Fund*, 2018 MT 259, ¶ 19, 393 Mont. 178, 430 P.3d 69). "[T]he Montana Legislature has recognized [that] 'health care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy and health care or other interests.'" *Wenger*, ¶ 28 (quoting *Nelson*, 283 Mont. at 242, 941 P.2d at 448; citing § 50-16-502(1), MCA). Contrary to the State's assertion, making public certain demographic information (such as the age, race, county, and number of children of the patient) does implicate a privacy right. In part, there is a risk that the patient could be identified based on the demographic information, particularly in small communities. In other words, the reporting requirements violate the fundamental privacy right that procreative autonomy decisions containing potentially identifiable information will not be subject to public disclosure. *See Wenger*, ¶ 28; *see also Armstrong*,

¶ 53 ("Few matters more directly implicate personal autonomy and individual privacy than medical judgments affecting one's bodily integrity and health.").

¶112 Given the clear implication on a patient's privacy right, the State must show a compelling interest. The District Court was correct in reasoning that these additional requirements do not mitigate a bona fide health risk, and in fact, potentially "harm patient safety and public health." This is distinguishable from other examples when reporting requirements for medical providers would advance a compelling interest. *Planned Parenthood of Mont.*, 2024 MT 178, ¶¶ 34-35 (reasoning that mandatory reporting laws requiring medical providers to report sexual abuse "advance the State's compelling interest of protecting minors from victimization"). The State has not shown the reporting requirements are narrowly tailored to protect a class of patients or the public from a bona fide health risk.

**Severability**

¶113 We construe statutes to avoid "unconstitutional interpretation whenever possible." *Williams*, ¶ 64 (citing *State v. Samples*, 2008 MT 416, ¶ 14, 347 Mont. 292, 198 P.3d 803). If a law contains unconstitutional provisions, we "examine the legislation to determine if there is a severability clause[,]" which indicates the "drafters desired a policy of judicial severability to apply to the enactment." *Williams*, ¶ 64 (citing *Finke v. State*, 2003 MT 48, ¶¶ 25-26, 314 Mont. 314, 65 P.3d 576). "When unconstitutional provisions are severed, the remainder of the statute must be complete . . . and capable of being executed in accordance with the apparent legislative intent." *Williams*, ¶ 64 (citing *Finke*, ¶ 26). This

Court may strike only the unconstitutional provisions if it "will not frustrate the purpose or disrupt the integrity of the law." *Williams*, ¶ 64 (citations omitted).

¶114   HB 171 is the only one of the challenged bills that contains a severability clause. 2021 Mont. Laws ch. 309, § 16.   The District Court determined that portions of § 50-20-703, MCA, and all of §§ 50-20-705, and -707 through -711, MCA, are void.  The State does not dispute the District Court's severability determinations on appeal.  Based on the analysis above, we agree with that determination, and additionally conclude that § 50-20-704, MCA (the in-person requirement), is void.  Like the District Court reasoned, the remaining provisions "frustrate the purpose" and "disrupt the integrity of the law." *Williams*, ¶ 64.  HB 171 is thus unconstitutional in its entirety.

**Dispute of Material Facts**

¶115   For HB 171, the State argues that disputed material facts include: risks of coercion; whether some medical procedures require in-person office visits (citing the rescission of allowances for other telehealth medicine from the COVID-19 pandemic); and PPMT witness testimony that patients already may have to wait longer than 24 hours for appointments.  As already discussed, the State's allegations over whether coercion is occurring are speculative and thus do not present a genuine dispute of material fact. *See Stanton v. Wells Fargo Bank Mont., N.A.*, 2007 MT 22, ¶ 29, 335 Mont. 384, 152 P.3d 115.  That other medical procedures may require in-person visits or PPMT patients may face wait times due to other facts is immaterial because they do not affect the relevant substantive law—namely, whether telehealth medication abortions can be safely provided

or a justification exists for adding additional barriers to the State's privacy infringement. *See DeVoe*, 281 Mont. at 366, 935 P.2d at 263.

¶116 The State also argues the efficacy of abortion reversal is still disputed, and this would show a lack of informed consent. Because no medical consensus exists regarding its efficacy, the State's evidence regarding abortion reversal does not change the outcome: the State has not shown by clear and convincing evidence a "medically acknowledged" bona fide health risk, grounded in the "collective professional judgment, knowledge and experience of the medical community" to justify forcing PPMT providers to advise on a treatment. *Armstrong*, ¶ 62; *Weems*, ¶ 47; *Planned Parenthood of Mont.*, 2024 MT 228, ¶ 22. Genuine issues of material fact are not in dispute regarding HB 171, and the District Court did not err in granting summary judgment.

¶117 *3. Does a law mandating that providers offer patients the opportunity to view an ultrasound and listen to a fetal heart tone violate Montana's constitutional guarantees of individual privacy?*

¶118 HB 140 requires providers to offer patients the opportunity to view an active ultrasound, an ultrasound image, and to listen to a fetal heart tone (if audible) prior to obtaining an abortion. Section 50-20-113(1), MCA. It provides exceptions to save the patient's life, when there are risks of irreversible injury to the patient, or to remove an ectopic pregnancy. Section 50-20-113(2), MCA. The patient must sign a form that confirms they were informed of the opportunity and indicate whether they chose to view the ultrasound or listen to the fetal heart tone. Section 50-20-113(3), MCA. The form must be retained in the patient's medical record but is not sent to DPHHS. Section 50-20-113(4), MCA. Providers in violation face civil penalties. Section 50-20-113(5), MCA.

64

¶119   The District Court reasoned there was no evidence that patients in Montana lack informed consent in abortion treatment, ultrasounds are usually offered by PPMT, and the mandates do not correspond to a bona fide health risk.  The court stated it was "left with the strong impression that the law aims to advance the ulterior motive of discouraging abortion," which is unacceptable under the law.

¶120   On appeal, the State argues that HB 140 does not violate the right to privacy but instead furthers informed consent and "provides knowledge about any potential complications that may arise."  It asserts that "the benefit to the patient for an optional service easily outweighs the minimal burden."  PPMT counters that HB 140 interferes with the provider-patient relationship "by forcing providers, regardless of their clinical judgment," to make these offers.  PPMT maintains that the law is not narrowly tailored because there is no evidence informed consent is not provided in abortion care.

¶121   We first ask whether HB 140 infringes on the right to privacy. *Wiser*, ¶ 15.  The broader right to privacy guaranteed by *Armstrong* is the ability to make medical decisions in conjunction with a health care provider.  *Armstrong*, ¶ 62; *Cross*, ¶ 28; *Wiser*, ¶ 15; *Weems*, ¶ 36. We do not adopt the State's assertion that HB 140 does not infringe a privacy right simply because it presents the option, which the patient is free to decline.  PPMT argued there are times when offering an ultrasound or the option to listen to the fetal heart tone would be contraindicated—such as in cases of rape or incest—and the state-created form uses stigmatizing language (the form mandates the person acknowledge they were given the opportunity to view the ultrasound and listen to the fetal heart tone of the unborn child).  HB 140 does not simply leave the decisions to the patient and provider.  Dissent,

65

¶ 171.  It instead mandates that the provider offer the options in the first place.  Like the consent form in HB 171, HB 140 infringes the right to privacy because it inserts the State's voice and judgment into the medical room, replacing the qualified medical provider's judgment with that of the State and impacting a patient's personal autonomy right to make medical decisions with the health care provider—respectively, the decision whether to get an ultrasound or listen to a fetal heart tone, and the decision whether to offer it in the first place.  *Armstrong*, ¶ 59; *Cross*, ¶ 32.  The State must show HB 140 is narrowly tailored to address a compelling interest of a medically acknowledged bona fide health risk. *Armstrong,* ¶ 34; *Weems*, ¶ 37.

¶122  The State asserts its compelling interest is furthering informed consent.  Our analysis here mirrors that in HB 171: the record shows that PPMT engages in an evidence-based practice to ensure informed consent and certainty in the decision to obtain an abortion and tailors questions and conversation to each patient.  We do not accept the State's argument that the offer is designed to reduce the risk of ruling out dangerous conditions, such as an ectopic pregnancy, or to help determine whether a medication abortion or dilation and evacuation abortion is appropriate by confirming the gestational age.  As analyzed above, the record shows that abortion care is safe.  More so, PPMT cited research studying medication abortion patients screened for ectopic pregnancies via telemedicine, which found no statistically significant difference in the rate of ectopic pregnancies between ultrasound and no-ultrasound groups.  PPMT providers testified regarding their procedures to determine an ectopic pregnancy and gestational age.  Whether an ultrasound is required or should be offered falls within the provider's judgment.  The

66

State cannot use "rul[ing] out dangerous conditions" as a bona fide health risk to justify this mandate, as there is not clear and convincing evidence to support it. *See Weems*, ¶ 46.

¶123 The State's argument that providers already offer ultrasounds and make efforts to provide fetal heart tones similarly does not help its argument. Increasing "a mother's instinct of protection" is not a medically acknowledged, bona fide health risk. Dissent, ¶ 171. The District Court correctly reasoned the decision is "best left to a patient and provider, relying on the provider's best medical judgment, not to a rigid statutory requirement." The State has not shown that bona fide health risks are present to justify the mandate to offer the patient these options in the manner required.

**Dispute of Material Facts**

¶124 On HB 140, the State asserts there are factual disputes because "abortion always ends an individual prenatal human life," and describes the dilation and evacuation procedure. These facts are not material because they are not part of the substantive law governing the claim. *DeVoe*, 281 Mont. at 366, 935 P.2d at 263. The State's interest in fetal life is not present until after viability, and it is unclear how describing the dilation and evacuation procedure—which the record shows to be safe—is relevant to whether requiring the offer of an ultrasound unconstitutionally infringes on a privacy right.

¶125 The State also asserts there are factual disputes about higher risks in the years following an abortion of negative mental and physical health outcomes. Once again, we note that the record shows that abortions are safe; for that reason, abortion care cannot be used to justify a bona fide health risk. *Weems*, ¶ 48. Even taking as true the State's allegations that some patients who have an abortion were at higher risk of mental health

issues following the procedure, the State fails to show how this factual dispute justifies mandating that doctors offer patients the opportunity to view ultrasounds and listen to fetal heart tones. *See Roe v. Kornder-Owen*, 282 Mont. 287, 293, 937 P.2d 39, 43 (1997) (whether a party was speeding would only be material if there were evidence it contributed to the parties' collision). Genuine issues of material fact are not in dispute regarding HB 140, and the District Court did not err in granting summary judgment.

¶126 The foregoing conclusions being determinative of the State's challenges on appeal, we do not address any remaining arguments.

## CONCLUSION

¶127 Reproductive decisions are among the most intimate that a person may make in their lifetime. This includes the decision to obtain a pre-viability abortion and the decision to carry a pregnancy to term—both of which carry widely varying personal considerations, decisions, hardships, and desires that are deeply unique and personal to each individual in Montana, and both of which are protected under the state constitutional right to privacy. We do not take lightly the varying beliefs that fuel the disputes surrounding these issues. The case before us follows decades of precedent that the Montana Constitution's right to privacy guarantees, absent a compelling state interest, "the right to be let alone"—which long has been recognized as one of the most important rights. *Gryczan*, 283 Mont. at 455, 942 P.2d at 125. This privacy right includes the right to personal and procreative autonomy under the Montana Constitution, wholly independent of federal constitutional standards. *Armstrong*, ¶¶ 39, 41 (citing *Gryczan,* 283 Mont. at 448, 942 P.2d at 121). The State has not established that the challenged laws address a medically acknowledged bona fide health

68

risk to justify infringing on the right of individuals to make medical judgments affecting their bodies in partnership with their health care provider, or that they are narrowly tailored to meet the compelling interests it asserts. *Armstrong*, ¶¶ 41, 62; *Weems*, ¶ 37.

¶128 We affirm the District Court's order declaring HB 136, HB 140, and HB 171 unconstitutional under Article II, Section 10, of the Montana Constitution. We also affirm its order declaring HB 136 unconstitutional under Article II, Section 4, of the Montana Constitution, and declaring HB 171 unconstitutional as impermissible viewpoint discrimination under Article II, Section 7, of the Montana Constitution. Accordingly, we affirm the District Court's judgment permanently enjoining the enforcement of §§ 50-20-601 through -606, 50-20-701 through -714, 50-20-105(4) and 50-20-113, MCA (2021), and the 2021 amendments to § 50-20-109, MCA.

/S/ BETH BAKER

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON

/S/ AMY EDDY
District Court Judge Amy Eddy
sitting for Chief Justice Mike McGrath

/S/ SHANE VANNATTA
District Court Judge Shane Vannatta
sitting for Justice Dirk Sandefur

69

Justice Jim Rice concurring in part, dissenting in part.

**Introduction**

¶129   I disagree with the Court's determination that the three abortion-related laws at issue are unconstitutional in their entirety, that nothing therein can be preserved, and that the State has failed to establish a compelling governmental interest in enacting any of them. Such an outcome, in my view, furthers an absolutist application of the right to privacy that fails to account for the State's vital role in protecting and preserving human life and to permit the State to act thereon.  The State's interest is vital because the protection of human life should be considered, and has been so considered since the foundations of American jurisprudence were laid, more than merely "compelling."  Protecting life was the first purpose in the founding of our democracy, and it should continue to be recognized as the State's highest interest.  The law cannot be correctly applied without starting with the unassailable proposition—that the inalienable right of living should be guaranteed to all persons "born free."  Mont. Const. art. II, § 3.

¶130   Preliminary points frame this discussion.  First, when I became a justice on the Court, *Armstrong* and its federal antecedents, including *Roe* and *Casey*, were the law of the land.  In compliance with *stare decisis*, I have dutifully followed *Armstrong*'s requirements in abortion-related cases that either did not directly call *Armstrong* into question or that involved preliminary relief for which the merits of precedent are not to be assessed.[1]  *See Planned Parenthood of Mont.*, 2024 MT 227, ¶ 46 ("I agree with the Court's

---

[1]  In applying *Armstrong*, I have asked the Court to not overstep its bounds and our other precedents.  *See, e.g.*, *Planned Parenthood of Mont.*, 2024 MT 228, ¶ 64 (Rice, J., dissenting) ("the

determination that it is inappropriate in the context of this review of a preliminary injunction to undertake consideration of the State's request to revisit our precedent governing the issue altogether, particularly, the holding in *Armstrong*.") (Rice, J., concurring and dissenting). Ironically, but tellingly, *Armstrong* itself violated these fundamentals of judicial restraint by not only reaching the substantive merits of a constitutional issue within a preliminary injunction matter, but also by resolving the case with a broad, sweeping ruling in such an appeal. *Armstrong*, ¶¶ 28, 75. The case before us today marks the first time during my tenure that the merits of *Armstrong* have been challenged in a manner that properly puts before the Court the consideration of the validity of that holding, in a supported argument that requests its reversal. Thus, I address the merits of the case herein. The Court rejects this challenge and broadly reaffirms *Armstrong*, even expanding it, with which I disagree.

---

right to obtain an abortion based upon the Montana constitutional right of privacy, which subjects medical regulations to a strict scrutiny review, does not create a concomitant constitutional right for public funding of private choice that is also subjected to strict scrutiny review"); *Planned Parenthood of Mont.*, 2024 MT 227, ¶ 54 (Rice, J., dissenting) ("lost in the discussion is a recognition that, like all constitutional rights, the right to privacy . . . is not absolute or exempt from any effort by the Legislature to assure appropriate protections for patients undergoing abortion procedures, for the pre-born child, and, as stated in the injunction statute, for the 'public interest' in ensuring that the abortion services have appropriate oversight"); *Planned Parenthood of Mont.*, 2024 MT 178, ¶¶ 61-62 (Rice, J., specially concurring) (noting legal classes created by the Consent Act should have been based on age); *Montanans Securing Reproductive Rights v. Knudsen*, 2024 MT 54, ¶ 53, 415 Mont. 416, 545 P.3d 45 (Rice, J., dissenting) (noting "'fetal viability' is not a concept that can be legally determined by the government on the basis of an objective criteria"); *Weems v. State*, 2019 MT 98, ¶ 36, 395 Mont. 350, 440 P.3d 4 (Rice, J., dissenting) (stating the Court mischaracterized "the State's interest as broadly restricting the rights of women patients to obtain [an abortion] . . . when the interest the State seeks to protect is much narrower, that is, ensuring that the proper regulatory authority affirmatively determines that individuals offering [abortion] are both licensed and competent to provide that type of care in order to safeguard life and health") (internal citations and quotations omitted).

¶131    Secondly, I express my respect for the federal and state judges who were called upon during their service on the bench to decide the abortion cases cited herein.  While I may disagree with the legal conclusions they entered and the outcomes they reached, I do not doubt their commitment to doing what they thought was right.  Nor should any comment herein be taken as a criticism more broadly of the independence of the judiciary, which is and remains, in my view, the genius of the American political system necessary for the protection of the rights of the citizens and for ensuring the rule of law.  Alexander Hamilton could not have been more succinct or clear: "*There is no liberty*, if the power of judging be not separated from the legislative and executive powers."  *The Federalist No. 78* (Alexander Hamilton) (emphasis added).  However, judicial independence does not equate to judicial infallibility.  Neither does it sanction the exercise of powers by judges that are beyond their province.  In this regard, and on this very issue, cases once considered to be landmark holdings have since been overturned entirely, including *Roe* and *Casey,* cornerstones of *Armstrong's* holding, on these very grounds—that judges had not only erred in their legal analysis but had exceeded their constitutional powers.  *See Dobbs*, 597 U.S. at 231, 142 S. Ct. at 2242.  Consequently, in response to the challenge properly before us, I first turn to the validity of the precedent cited by *Armstrong* and the foundations upon which it was decided.

**The Judicial Overreach of *Roe* and its Aftermath**

> "*Roe* overreached and exceeded this Court's constitutional authority; gravely distorted the Nation's understanding of this Court's proper constitutional role; and caused significant harm to what *Roe* itself recognized as the State's 'important and legitimate interest' in protecting fetal life."

*Dobbs*, 597 U.S. at 343, 142 S. Ct. at 2307 (Kavanaugh, J., concurring).

¶132   One will search in vain for a source of authority supporting the notion that the judiciary is constitutionally empowered in our democracy to amend the constitution, add to the Bill of Rights approved by the people, or undertake duties constitutionally assigned to the citizens or their elected representatives—let alone supporting the idea that the most unrepresentative and detached body of the government should become the arbiter of the values held by the society.  This is particularly true regarding a decision, *Roe*, that would run directly counter to the nation's "deeply rooted" history and tradition.  *See Dobbs*, 597 U.S. at 239, 142 S. Ct. at 2247 ("a fundamental right must be 'objectively, deeply rooted in this Nation's history and tradition'" (quoting *Washington*, 521 U.S. at 720-721, 117 S. Ct. at 2302)).  While there are jurisprudential nuances about the constitutional roles of the three branches of government that would place these tenets into a clearer context, nonetheless, even stretching such nuances as far as possible would not justify the colossal constitutional errors of *Roe* that violated all of them.

¶133   The *Roe* Court began by recognizing "[t]he Constitution does not explicitly mention" any right to abortion, but after engaging in a single paragraph discussion about what it called "zones of privacy" that were recognized by prior decisions in other contexts, it leaped to the unsupportable conclusion that, under the Fourteenth Amendment, a "right of privacy" existed and necessarily encompassed "a woman's decision whether or not to terminate her pregnancy."  *Roe*, 410 U.S. at 153, 93 S. Ct. at 727.  The *Roe* Court then proffered a three-trimester system of regulation, concluding that a state may act to preserve "potential human life" only after the point of viability, which the Court determined was the

beginning of a woman's third trimester, around 28 weeks gestation. *Roe*, 410 U.S. at 159-61, 93 S. Ct. at 730. "Th[is] decision," said the Court, "leaves the State free to place increasing restrictions on abortion as the period of pregnancy lengthens, so long as those restrictions are tailored to recognized state interests." *Roe*, 410 U.S. at 165, 93 S. Ct. at 733.

¶134 The *Roe* Dissenters prophetically expressed—given that their views would ultimately be vindicated—great concern about the *Roe* Court's "exercise of raw judicial power." *Doe v. Bolton*, 410 U.S. 179, 222, 93 S. Ct. 739, 763 (1973) (White, J., dissenting).[2] Justice White objected:

> I find nothing in the language or history of the Constitution to support the Court's judgment. The Court simply fashions and announces a new constitutional right . . . [and] invests that right with sufficient substance to override most existing state abortion statutes. The upshot is that the people and the legislatures of the 50 States are constitutionally disentitled to weigh the relative importance of the continued existence and development of the fetus, on the one hand, against a spectrum of possible impacts on the mother, on the other hand.

*Doe*, 410 U.S. at 221-22, 93 S. Ct. at 763 (White, J., dissenting). Justice Rehnquist, noting that abortion restrictions were common throughout the states and that a right to an abortion was not rooted "in the traditions and conscience of our people," stated that the Court had found "within the scope of the Fourteenth Amendment a right that was apparently completely unknown to the drafters of the Amendment." *Roe*, 410 U.S. at 174, 93 S. Ct. at 737 (Rehnquist, J., dissenting); *see also Dobbs*, 597 U.S. at 231, 142 S. Ct. at 2242

---

[2] *Doe v. Bolton* was a companion case to *Roe*, involving challenges to Georgia's abortion laws, and was decided on the same day as *Roe*.

(noting that, "[u]ntil the latter part of the 20th century, [the right to abortion] was entirely unknown in American law"). He lamented that the Court's new three-trimester system of abortion regulation was more "judicial legislation" than a proper "determination of the intent of the drafters of the Fourteenth Amendment." *Roe*, 410 U.S. at 174, 93 S. Ct. at 737 (Rehnquist, J., dissenting).

¶135 Criticism of the decision rained down, and even supporters of the case's outcome were reticent in following years to defend the Court's reasoning. *See Casey*, 505 U.S. at 931, 112 S. Ct. at 2848 (Stevens, J., dissenting) (acknowledging that *Roe* "more closely resemble[d] a regulatory code than a body of constitutional doctrine"). The fallout from *Roe*'s judicial overreach included "abruptly end[ing]" the then-ongoing work of resolving the abortion issue through the political process, and instead "sparked a national controversy that has embittered our political culture for a half century." *Dobbs*, 597 U.S. at 228, 142 S. Ct. at 2241; *see also* Ruth Bader Ginsburg, *Speaking in a Judicial Voice*, 67 N.Y.U. L. Rev. 1185, 1208 (1992) (explaining that *Roe* "halted a political process," "prolonged divisiveness," and "deferred stable settlement of the [abortion] issue" by legalizing abortion nationwide overnight).

¶136 Nonetheless, *Roe* was the decision of the nation's highest court, and was final. As Justice Robert Jackson explained about the Supreme Court, "[w]e are not final because we are infallible, but we are infallible only because we are final." *Brown v. Allen*, 344 U.S. 443, 540, 73 S. Ct. 397, 427 (1953) (Jackson, J, concurring). Beyond rewriting the Constitution and subverting the democratic political process, *Roe* brought change to cultural understanding, as Americans came to live under a Constitution that granted a right

of abortion, regardless of the legally unsupportable basis of that right. To be sure, there were continual efforts in subsequent years to obtain a reversal of *Roe*, leading to the 1992 *Casey* decision. However, while the *Casey* Court attempted to repair some of *Roe*'s flaws, permitting post-viability bans and adopting the "undue burden test" for pre-viability regulation, *see Casey*, 505 U.S. at 879, 112 S. Ct. at 2811 ("[w]henever it may occur, the attainment of viability may continue to serve as the critical fact" marking "the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions"), the plurality opinion declined to overturn *Roe's* central holding that the right to a pre-viability abortion was a constitutionally protected privacy interest. *Casey*, 505 U.S. at 879, 112 S. Ct. at 2821. Even then, 19 years down the road from *Roe*, it was deemed to be too late; the Court had opened Pandora's box and it could not again be closed: "An entire generation has come of age free to assume *Roe*'s concept of liberty. . . . Within the bounds of normal *stare decisis* analysis, [] and subject to the considerations on which it customarily turns, the stronger argument is for affirming *Roe*'s central holding, with whatever degree of personal reluctance any of us may have, not for overruling it." *Casey*, 505 U.S. at 860-61, 112 S. Ct. at 2811. Notably, this was the state of federal law seven years later when this Court decided *Armstrong* in 1999.

¶137 *Roe* thus stood for nearly half a century during which society made large technological advances, ushering in the digital age of social media, iPhones, virtual reality, and accessible 3-D imaging and modeling, to name a few. Medicine improved markedly, leading, to date, to the delivery and survival of a child born in 2020 at 21 weeks and 1 day gestation. Univ. of Ala. at Birmingham, *UAB Hospital delivers record-breaking*

76

*premature baby*, UAB News (Nov. 10, 2021) https://perma.cc/R8BH-K56P. Over the 49 years until *Dobbs*, it is estimated that over 63 million abortions occurred in America. National Right to Life Committee, Inc., *The State of Abortion in the United States* (Jan. 2022) https://perma.cc/SQC6-A46K. Aside from the devastating loss of human life and human potential this statistic represents, it demonstrates for purposes of this case that citizens of our country came to clearly understand and widely act upon the judicially created right pronounced by *Roe*.

¶138   In 2022, the U.S. Supreme Court revisited its abortion precedent, and overruled *Roe* and *Casey*. The ruling did not re-criminalize abortion but sought to counter the central legal error of *Roe* and instead "heed the Constitution and return the issue of abortion to the people's elected representatives." *Dobbs*, 597 U.S. at 232, 142 S. Ct. at 2243. The Court reasoned that *stare decisis* did "not compel unending adherence to *Roe*'s abuse of judicial authority" because "*Roe* was egregiously wrong from the start" and courts must have the latitude to right their wrongs, regardless of the time elapsed from such a ruling. *Dobbs*, 597 U.S. at 231, 142 S. Ct. at 2243. While this reasoning correctly captured both the error of *Roe* and the standard jurisprudential limits of *stare decisis*, by 2022, abortion had been an individual constitutional right for 49 years and generations of individual Americans had lived their lives accordingly. How could a court eviscerate such longstanding precedent granting and furthering a constitutional right and thereby up-end in one fell swoop the stability of the applicable law and society's reliance upon it? As Justice Kavanaugh aptly noted, "the fact that a precedent is wrong, even egregiously wrong, does not alone mean that the precedent should be overruled." *Dobbs*, 597 U.S. at 343, 142 S. Ct. at 2307

77

(Kavanaugh, J., concurring). While it may be rightly said that it is never too late to right a wrong, the accompanying inquiry should be: under the circumstances, what is the prudent method for doing so? Sometimes removing a bullet from the body is more dangerous than leaving it in. One thing was sure: the Supreme Court could not reverse the thousands of cases that had been decided based upon *Roe* in the intervening 49 years, including *Armstrong*. Further, the Supreme Court not only bore in *Dobbs* a general duty under *stare decisis*, which promotes stability of the law and of society and counterweighs the destabilizing consequences of judicial activism, but also bore, more specifically, the public pronouncements of the justices during their confirmation processes that *Roe* was "settled law." Does this mean longstanding precedent is "settled" until there are enough votes to overturn it? If so, *stare decisis* is merely a tool of convenience of a majority and makes it possible, in the context of this case, that a federal abortion right could once again be declared in the future by a new makeup of the Court's membership. If *Roe* can be cast aside after 49 years, why can't *Dobbs* suffer the same fate 20 years from now? This is how judicial activism—whether by justices holding liberal values or conservative values—leads to politicalization of the courts and wrongfully makes the judiciary the outsized tail that wags the dog of democracy. This is not the proper role of the courts; constitutional rights should not swing back and forth depending upon a court's makeup.

¶139   The *Dobbs* Court reasoned that amending the Constitution is "notoriously" difficult, *Dobbs*, 597 U.S. at 264, 142 S. Ct. at 2262, but in my view it is preferable to failing to follow, and thus degrading, *stare decisis* in a case involving a 49-year-old individual constitutional right, and thereby encouraging courts to act similarly in the future, including

78

the possibility of successively re-imposing and re-striking the abortion right depending on the Court's membership. As demonstrated by history, Americans are capable of restricting a right they already possess (U.S. Const. amend. XVIII), and of restoring a right they have lost (U.S. Const. amend XXI). It is not the Court's role to do so for them.

¶140 *Roe* and its tragic progeny demonstrate with unmatched clarity the negative consequences that ensue when justices fail to consider the parameters of their constitutional powers and overreach by acting beyond them. Other than self-discipline and prudence, there is little else in the short term to prevent justices from writing whatever they please on a piece of paper or a computer screen when drafting a legal decision. Fortunately, however, the jurisprudential limitations upon judges are not hidden. Looking to precedent, judges are to uphold the Constitution, not add to it or subtract from it, and "interpret the Constitution by giving 'effect to the intent of the people adopting it.'" *Mont. Ass'n of Counties v. State*, 2017 MT 267, ¶ 25, 389 Mont. 183, 404 P.3d 733 (quoting *State ex rel. Hinz v. Moody*, 71 Mont. 473, 481, 230 P. 575, 578 (1924)). With that in mind, I turn to Montana's law.

**The 1972 Montana Constitutional Convention and Ratification**

> "[Abortion] was brought before the committee. We decided we should not deal with it within the Bills of Rights. It is a legislative matter insofar as we are concerned. . . . It has no part at this time within the Bill of Rights of the Constitution of the State of Montana."
>
> > --Wade Dahood, Delegate, 1972 Constitutional Convention, and Chairman, Bill of Rights Committee, speaking on the floor against the Kelleher abortion amendment, March 7, 1972.
>
> "In fact the Bill of Rights Committee specifically refused to deal with the issue of abortion in any way. The question is for the legislature."

--Wade Dahood, *Dahood Defends New Constitution*, The Independent Record, June 1, 1972.

¶141   *Roe* and its aftermath, discussed above, occurred after the adoption of the 1972 Montana Constitution.  However, abortion was nonetheless an issue being debated in the public square prior to adoption of the Constitution.  *See* Frank Adams, *Emotion-Packed Abortion Issue May Face Con Con Delegates,* Great Falls Tribune (Oct. 29, 1971), *available at* https://perma.cc/FL99-JUH2.  The Adams article reported:

> There's a possibility that the controversial question of abortion reform could be placed on the ballot next year by the constitutional convention, although such a move is apparently not contemplated at this time. . . .  The right to privacy may be a key issue if the delegates decide to debat[e] abortion.  The California Supreme Court ruled in 1965 that the right of privacy in the U.S. Constitution covers the right of a woman to an abortion. . . .  [T]he issue would probably be centered in the question of whether the state has a compelling interest in the regulation of abortions and to what extent it can be pursued without infringing individual rights.

Adams, *Emotion-Packed Abortion Issue May Face Con Con Delegates,* Great Falls Tribune (Oct. 29, 1971).  However, despite the public identification of the abortion issue, the Delegates steered away from constitutionalizing it and reserved the issue for the Legislature to address.  The Court states, as did *Armstrong*, that a right to abortion is implied from the right of privacy, Opinion ¶ 20, but an examination of the constitutional text and history, including the explanation of Delegate Dahood on the floor of the Convention before the only abortion vote taken, reveals there is no support for the notion that abortion was linked with the right to privacy by the Montana Delegates, or that such a linked right was submitted to Montana electors and ratified by them in 1972.  Any

"implication" to be drawn is exactly the opposite: no constitutional abortion right was intended.

¶142 We are first to consider the text of the Constitution itself:

> [A] fundamental rule of constitutional construction is that we must determine the meaning and intent of constitutional provisions from the plain meaning of the language used without resort to extrinsic aids except when the language is vague or ambiguous or extrinsic aids clearly manifest an intent not apparent from the express language.

*Nelson*, ¶ 16; *Brown*, ¶ 33; *see also Keller v. Smith*, 170 Mont. 399, 405, 553 P.2d 1002, 1006 (1976) (the intent of the framers "shall first be determined from the plain meaning of the words used"). A plain reading of Article II, Section 10, demonstrates clearly that an abortion right, despite the identification of the issue within public debate, was not included within its language.

¶143 Moving from the text to extrinsic evidence from the Convention, there was one vote taken on the issue of abortion. Delegate Kelleher proposed an amendment to the Constitution that would have prohibited abortion altogether. Delegate Dahood, Chairman of the Bill of Rights Committee, opposed the amendment by providing this explanation:

> Mr. Chairman, I stand in opposition to the amendment. What Delegate Kelleher is attempting to do at this time is, by constitutional command, prohibit abortion in the State of Montana. That issue was brought before the committee. We decided that we should not deal with it within the Bill of Rights. It is a legislative matter insofar as we are concerned. . . . It has no part at this time within the Bill of Rights of the Constitution of the State of Montana, and we oppose it for that reason.

Conv. Tr., Vol. V, p. 1640. No further debate, for or against the Kelleher amendment, followed Dahood's explanation, and the proposal was then voted down by the Delegates, 15-71. This negative vote is often cited as a basis to imply an intention on the part of the

81

Delegates to include an abortion right, but, as demonstrated by a reading of the transcript, this is clearly incorrect. The amendment was defeated after the above-quoted singular explanation was provided that abortion "is a legislative matter insofar as we are concerned," and "has no part" within the Bill of Rights. Indeed, upon that explanation, defeat of the proposed prohibition amendment was perfectly logical: if the Delegates' intention was to reserve the issue to the Legislature, then they necessarily had to defeat an amendment that would have constitutionally prohibited abortion entirely, and they did so. Otherwise, it would not have been possible for the issue to be taken up by the Legislature. Further, Chairman Dahood's floor statement had correctly reflected the Bill of Rights Committee's proposal. The Bill of Rights Committee decided to make the right to privacy nonspecific so that *the Legislature* would "have occasion to provide additional protections for the right of privacy in explicit areas where safeguards are required." Conv. Comm. Proposals, Vol. II, p. 632. Consequently, concerning a right of abortion, the direct evidence from the Convention demonstrates that the Delegates did not remove the issue from the democratic process, and did not affirmatively incorporate an abortion right within the right of privacy. This was consistent, as noted above, with the plain text of the provision.

¶144 In stark contrast, there is an abundance of direct evidence from the Convention about what the Delegates intended to affirmatively and definitively include within the right of privacy. In the deliberations about the right of privacy, proposed by Delegate Campbell, he noted that, "the Montana Supreme Court [] has recognized the right of privacy, although it has not been expressly stated in the Montana Constitution." Conv. Tr. Vol. V, p. 1681. This was correct. The Montana Supreme Court had previously discussed the right of

82

privacy in one context, which was eavesdropping on a telephone conversation. *See, i.e.,*

*State v. Brecht*, 157 Mont. 264, 270-71, 485 P.2d 47, 51 (1971). The Court had not

discussed the right in other contexts, and certainly not in the abortion context. Indeed, at

the time of the Constitutional Convention and continuing thereafter, abortion in Montana

was a crime punishable by up to five years in the state prison. Rev. Codes of Mont.

§§ 94-401, -402 (1947). Campbell's comments advanced this purpose—the concerns of

privacy in an era of rapidly-changing technology. Indeed, in his closing summary of his

presentation on the proposed Article II, Section 10, Campbell extensively quoted a

February 3, 1972, editorial published in the *Montana Standard*:

> Times change. That, in a nutshell, is why the Constitutional Convention
> delegates in Helena are working on a new and more modern governmental
> charter for Montana. *Today, with wiretaps, electronic and bugging devices,*
> *photo surveillance equipment and computerized data banks, a person's*
> *privacy can be invaded without his knowledge and the information so gained*
> *can be misused in the most insidious ways*. . . . [W]ith technology easily
> available and becoming more refined all the time, prudent safeguards against
> the misuse of such technology are needed. Some may urge and argue that
> this is a legislative, not a constitutional issue. We think the right of privacy
> is like a number of other inalienable rights; a carefully worded constitutional
> article reaffirming this right is desirable.

Conv. Tr., Vol. V, p. 1681 (emphasis added). This was the Delegates' *expressed* reason

for adopting the right of privacy. Neither Campbell nor any other Delegate suggested

during their deliberations that abortion would or could be included as a constitutional right,

or even mentioned abortion at all. This was consistent with the intention expressed during

the vote on the Kelleher amendment to reserve the issue for the Legislature.

¶145 This Court has leaned heavily in its cases on Delegate Campbell's reference to

*Griswold* in his discussion about the proposed right of privacy. It is correct to note that

83

this comment was part of the Convention's deliberations, but, again, proper analysis of it requires full context of the record. *Griswold* was a pre-*Roe* decision that did not address abortion, but rather contraception.[3] None of the Delegates indicated that they perceived a connection between *Griswold* and the possibility of a constitutional right to abortion, which made perfect sense: as noted above, abortion was a crime in Montana in 1972, unlike contraception. Rev. Codes of Mont. §§ 94-401, -402 (1947). No Delegate mentioned the 1965 California Supreme Court decision that held a right of privacy included the right to abortion, which had been reported in the Adams article quoted above prior to the Convention. No Delegate stated or even hinted that consideration was being given to including an abortion right that would contradict or nullify the then-current state of the law, not to mention be enormously controversial. Any such thought by any Delegate was necessarily one that was kept in the secret recesses of the mind, and outside the Convention record.

¶146 The Court's analysis of constitutional history about the right of privacy stops there, Opinion, ¶¶ 17, 21, but the evidence does not stop there. Explanations about the proposed Article II, Section 10, were communicated to the electors, in both formal and informal ways, to educate them about the provision before the vote on ratification. *See N.Y. State Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1, 34, 142 S. Ct. 2111, 2136 (2022) ("'[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*'") (quoting *D.C. v. Heller*, 554 U.S. 570, 634-35, 128 S. Ct. 2783,

---

[3] The Montana Supreme Court had not referenced *Griswold* at the time of the Constitutional Convention.

2821 (2008)) (emphasis in original); *see also* Tyler M. Stockton, *Originalism and the Montana Constitution*, 77 Mont. L. Rev. 117, 133 (2016) ("[s]tate constitutions owe their enactment and authority to the voters in a given state"). While Constitutional Convention transcripts "'provide a substantial body of linguistic evidence of how words and phrases—especially the words in phrases in the Constitution—were used,' and are therefore the best source for its original public meaning," Ben McKee, *A Boring Supper: Looking Less Hard for Meaning in the Montana Constitution*, 85 Mont. L. Rev. 123, 141 (2024) (citing Gregory E. Maggs, *A Concise Guide to the Records of the Federal Constitutional Convention of 1787 as a Source of the Original Meaning of the U.S. Constitution*, 80 Geo. Wash. L. Rev. 1707, 1739 (2012)), the transcripts of the 1972 Convention were not available to voters at the time of the ratification vote, and did not become publicly available until 1981. *See* Conv. Tr., Vol. III, Preface; Stockton, *Originalism and the Montana Constitution*, 77 Mont. L. Rev. at 138 ("[w]hile the transcripts might provide meaning for what the delegates believed a provision meant, since they were not publicly available, they could not have formed the basis for the broad public meaning"). Thus, the meaning of the proposed Constitution which was conveyed to the ratifying public must be drawn from other sources.

¶147 After the Constitutional Convention adjourned, the Montana Secretary of State distributed 400,000 copies of The Proposed 1972 Constitution for the State of Montana Official Text with Explanation (Voter Information Pamphlet) in the Sunday editions of various Montana newspapers. *State ex rel. Kvaalen v. Graybill*, 159 Mont. 190, 195, 496 P.2d 1127, 1130 (1972). The Voter Information Pamphlet noted that it was "The

85

official publication of the 1972 Constitution proposed by the 1971-1972 Montana Constitutional Convention as adopted on March 22, 1972" and that its publication was "required by Chapter 296, 1971 Laws of Montana" and "made possible by an appropriation by the Montana Legislature." *See* Proposed 1972 Constitution of the State of Montana: Official Text with Explanation, p. 1 (1972), *available at* https://perma.cc/M2Q7-Z4UZ. The Voter Information Pamphlet included explanations of the differences between the then-existing 1889 Montana Constitution and the proposed Constitution for ratification, noting grammatical as well as substantive changes made by the proposed Constitution. For example, in the "Highlights" section, the Voter Information Pamphlet listed the "New Provisions Added" under Article VII (the Judiciary), noting a shift from the 1889 Constitution in that: "[t]erms of office for supreme court increased from six to eight years; district court terms increased from four to six years, and justice of the peace terms increased from two to four years." Voter Information Pamphlet, p. 4. The "Highlights" section also listed the "Right of privacy. Section 10." as a "New Provision," Voter Information Pamphlet, p. 3, and, in the body of the Voter Information Pamphlet, contained an explanatory note stating: "New provision prohibiting any invasion of privacy unless the good of the state makes it necessary." Voter Information Pamphlet, p. 6. The terms "abortion," "pregnancy," "autonomy" or any such words did not appear within the Voter Information Pamphlet. If abortion was intended to become a constitutional right, which would have made Montana one of the first states to decriminalize the act, it was surely not reflected within the Voter Information Pamphlet. As such, the Voter Information Pamphlet

did nothing to alert Montanans to even a possibility that abortion could be included within the right of privacy.

¶148 Pamphlets were also distributed by Constitutional Convention Delegates themselves. Dr. Richard Roeder, a Montana State University history professor and Delegate, published what became known as the "Roeder Pamphlet," which was distributed extensively in newspapers across Montana. Stockton, *Originalism and the Montana Constitution*, 77 Mont. L. Rev. at 144. The Roeder Pamphlet referenced the Court's prior recognition of the right of privacy, and placed the new provision in the context of protection against advancing technology, explaining, "at a time when opportunities for invasion of privacy are increasing in number and sophistication, section 10 emphasizes that this right is essential for the preservation of a free society." Concerned Citizens for Constitutional Improvement, Proposed Constitution for the State of Montana (1972), p. 2, *available* at https://perma.cc/T4KT-P32J. It said nothing about abortion or personal decisions.

¶149 Another pamphlet, published and distributed by Billings attorney and Delegate Gerald Neely, examined each provision, providing in some instances paragraphs of analysis about the differences between the 1889 Constitution and the 1972 proposed Constitution and the implications of enacting the new Constitution. Gerald J. Neely, The New Montana Constitution: A Critical Look (1972), *available at* https://perma.cc/Q59W-EW5F (hereinafter, the "Neely Pamphlet"). Despite his lengthy review of some provisions, Neely wrote of the proposed Article II, Section 10: "A new provision in the proposed constitution . . . provides that the privacy of the individual is not to be [infringed] without the showing of a compelling state interest." Neely Pamphlet, p. 7.

Thus, the entirety of Neely's discussion about the new right of privacy was merely a restatement of the provision itself. However helpful or unhelpful that was, it did not mention abortion or the domain of personal decisions.

¶150 Significantly, numerous news articles covering the Constitutional Convention placed the "right of privacy" in the context of needing protections from "electronic eavesdropping," "surveillance or bugging," "[p]articular types of electronic devices," "military spying," and "computer banks." Alexander Blewett III Sch. of L., *Documentary History of the Ratification of the Montana Constitution*, William J. Jameson L. Libr., Brown Collection, pp. 9, 18, 40, 149, *accessible at* https://perma.cc/Q84N-UXKC (collecting newspaper clippings from the Constitutional Convention era). No mention is found anywhere in these articles to even a possibility that the right could include a constitutional right to abortion or even that it would protect some kind of zone of personal decision-making. Rather, and to the degree that the extensive emphasis on advancing technological devices could be said to still leave the door open for other rights, such as abortion, the door was slammed shut by the Delegates' public statements. Delegate Dahood, Chairman of the Bill of Rights Committee, wrote a newspaper guest column shortly before the ratification vote in which he explained, echoing his statement on the Convention floor, that "the Bill of Rights Committee specifically refused to deal with the issue of abortion in any way. The question is for the legislature." Wade Dahood, *Dahood Defends New Constitution*, The Independent Record, June 1, 1972; *see also* Gerald Neely, *The Bill of Rights: Analysis*, CON CON Newsletter, Mar. 10, 1972, p. 7 (abortion is "*not included* in the proposed version [of the Bill of Rights]") (emphasis added).

¶151 Consequently, that the public at large understood that the new Constitution included or would permit a constitutional right of abortion when they were voting is demonstrably false. The Court takes comfort in Delegate Campbell's statement that the Bill of Rights Committee did not define the right by "specific examples," Opinion, ¶ 17, but this statement implies the Convention simply took no action on abortion, which is incorrect. To the contrary, the Convention affirmatively addressed the issue by voting to make abortion a legislative issue, and this explanation was reiterated in statements made to the public before the ratification vote. At that time—1972—abortion was contrary to the deeply rooted history and traditions of the Montana electorate, as is evidenced by the civil and criminal code at the time of ratification. The position that this constitutional history could support the declaration of a constitutional right to abortion is untenable. Would Montanans have approved the 1972 Constitution had they been given an assessment that it would or could include the right to abortion under any section—which would have been the honest and accurate thing to do if anyone so intended? Without question, no.

**_Armstrong_ and Absolutism in the Abortion Right**

¶152 _Armstrong_ was decided in 1999, which was, as noted herein, during the time that a federal constitutional right to abortion was recognized under the _Roe-Casey_ precedent. Thus, _Armstrong_ must be considered correct to the extent of the federal right; a state court must recognize the floor of rights provided by the U.S. Constitution. But, in my view, _Armstrong_ went far beyond that, and cases following have reached the realm of absolutism under the Court's application of its framework.

¶153    *Armstrong* was not, in my opinion, a genuine search for truth about the nature of the right of privacy intended and adopted by the Delegates, and presented to and approved by the voters; to the extent it purported to draw an implied right to abortion in our constitutional history, it was sorely incorrect. It did not give "'effect to the intent of the people adopting it.'" *Mont. Ass'n of Counties*, ¶ 25 (quoting *State ex rel. Hinz*, 71 Mont. at 481, 230 P. at 578). Rather, *Armstrong* was a mission to approve a broad abortion right and grant *carte blanche* authority to the courts to expand the right of privacy, here, regarding abortion, at will—directly contradicting the intention of the Delegates and of the voters to reserve the issue for the Legislature. Reading the opinion makes this clear. The Court did not carefully search out our constitutional history, summarized above, but instead invoked other sources, such as commentators and philosophers, to explore "notions of the right of privacy" and adopt a broad theoretical or philosophical right not premised upon the Montana right or recognizable from its history. *Armstrong*, ¶ 30. In short, it created *a* suppositional right of privacy disconnected from *the* actual right of privacy proposed by the Delegates and approved by Montana voters. *Armstrong*'s various notions about privacy were neither approved nor even considered by the Constitutional Convention Delegates, the electorate, or the Legislature, but only by a group of justices cloistered in Helena, and which included "personal autonomy," "procreative autonomy," and privacy "components" that would not only include abortion but any number of additional unidentified rights not approved by the Delegates and voters. This must be called out for what it is: the Court drawing connections where none even reasonably existed in our history and precedent—echoes of the overreach of *Roe*.

¶154  "Personal autonomy" was not a phrase used by the Delegates or shared with the voters.  "Procreative autonomy" was a phrase not used by the Delegates, nor shared with the voters, and is a concept that was not previously associated with the right of privacy.  The phrase did not appear in *Griswold*, nor does it appear in any other Supreme Court case to date.  While other courts had used the phrase in other contexts, *Armstrong* was the first court in the nation to use the phrase "procreative autonomy" in connection with a right to abortion.  *Compare Armstrong*, ¶ 14, *with Canesi v. Wilson*, 158 N.J. 490, 509, 730 A.2d 805, 815 (1999) (assessing whether parents could recover under a "claim for negligent interference with procreative autonomy" when they were not warned of the risk for fetal defect caused by a drug).  Nonetheless, the Court ordained such concepts as constitutional and, in so doing, broadened Article II, Section 10, into an umbrella that incorporates, and could further incorporate, an unlimited number of propounded theories of "private" action, however foreign to the place such action holds in society and in our constitutional history.  The Court used *Roe* to prop up this framework, because *Roe* was the only authority extreme enough to support it, including the idea that "[t]his right of privacy . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy."  *Roe*, 410 U.S. at 153, 93 S. Ct at 727.  Apparently because there was such little state authority to support its philosophizing, the Court turned to religious animus.

¶155  The Court reasoned that "[t]he fundamental right to personal and procreative autonomy and, in the broader sense, to individual privacy, prohibits the government from dictating, *approving or condemning values, beliefs and matters . . . where, at their core, such values and beliefs reflect essentially religious convictions* that are fundamental to

91

moral personality." *Armstrong*, ¶ 68 (emphasis added). Stating that opposition to abortion was, at its "core," a "religious conviction," the Court invoked "the doctrine of separation of church and state" to hold that those who hold public office are prohibited from responding to religiously based concerns. *Armstrong*, ¶¶ 69-70. How the doctrine of separation of church and state could possibly be inserted into the analysis of the right to privacy is simply unknown in the universe of jurisprudence. *See Harris v. McRae*, 448 U.S. 297, 319-20, 100 S. Ct. 2671, 2689 (1980) ("we are convinced that the fact that the funding restrictions in the Hyde Amendment may coincide with the religious tenets of the Roman Catholic Church does not, without more, contravene the Establishment Clause"). Extremely troubling was the clear holding that the Court was barring public officials from acting in any way that would reflect the "personal values" of religious people, and only religious people. *See Armstrong*, ¶ 70 ("those in government who make, execute and interpret the law . . . may not, except in violation of their oaths of office, succumb to the pressure of those who would engraft the sectarian tenets and personal values" into the law). The *Armstrong* Court did not restrict public officials from "succumbing to the pressure" of atheists, agnostics, flat earthers or other groups to engraft their particular sets of "personal values" into the law. Neither was it appropriate to do so with regard to those who are religious. In our pluralistic democracy, the First Amendment secures the right of everyone, religious and nonreligious, to advocate their views in the public square and to petition public officials based upon their "personal values," and it is not a *per se* constitutional violation for officials to heed the concerns of citizens in

92

performing their duties. That is how laws are made in a representative democracy, and it was purely religious discrimination by the Montana Supreme Court to require otherwise.

¶156 *Armstrong* deserves to be relegated to the dustbin of history. It replaced Montana's unique constitutional history with philosophical preferences, and discriminated against those who disagreed. However, as explained above, it was also partially correct as a product of *Roe*'s precedent. At the time, the Court was required to enforce at least the federal constitutional right to abortion, and, to that extent, it was correct in doing so. Thus, a fundamental constitutional right was granted based upon then-legitimate federal precedent, and which conformed the Montana Constitution to that necessary minimum. Montanans have exercised that right ever since, and what I said above regarding *stare decisis* and the finality of *Roe* likewise applies to *Armstrong*. For the past 26 years, Montanans have lived their lives under a state Constitution which this Court said granted a right of abortion, which is significant to the law.[4] The purpose of *stare decisis* is to promote stability and predictability in the law, and to protect the law from swings based upon judicial activism. "[T]he fact that a precedent is wrong, even egregiously wrong, does not alone mean that the precedent should be overruled." *Dobbs*, 597 U.S. at 343, 142 S. Ct. at 2307 (Kavanaugh, J., concurring). And, amending the Montana Constitution

---

[4] A 19-year-old woman at the 2022 March for Montana Reproductive Rights expressed fear that her right to abortion may be on shaky footing, stating: "I now have the potential to have less rights than my mother did when she was my age." Jonathon Ambarian, John Riley, and Sam Hoyle, *More than a thousand march on Montana Capitol opposing Roe v. Wade overturn* (June 26, 2022) https://perma.cc/S54X-GRUR. This young woman's remark is illustrative of the generational impact caused by the judicially constructed right to abortion and its prolonged existence in Montana.

is not nearly as difficult as amending the U.S. Constitution. As demonstrated by history, and recent history, Montanans are quite capable of adopting the constitutional rights they want to have. Opinion, ¶ 42 (referencing election results for CI-128). It is not this Court's role to make changes for them.

¶157 However, as our precedent also demonstrates, it is not inconsistent with *stare decisis* to clarify or adjust precedent without overruling it. *Dempsey v. Allstate Ins. Co*., 2004 MT 391, ¶¶ 30-35, 325 Mont. 207, 104 P.3d 483. Acknowledgment of a long-established constitutional abortion right does not mean that the Court has never erred in applying it, and I believe it has done so. The Court has repeatedly stated, and does so again today, that the abortion right is "not absolute." However, its words do not match its actions because, in practice, the Court has so held. The reality is that, despite repeating that the right is not absolute, its application has further advanced in that direction. Since 1999, the Court has struck down every single abortion regulation, no matter how large or small, on the ground that the State was not deemed to have demonstrated a sufficiently compelling interest for its proposed regulations, or the existence of a medically-acknowledged, bona fide health risk that *Armstrong* required. *See generally Weems*, 2019 MT 98; *Planned Parenthood of Mont.*, 2022 MT 157; *Montanans Securing Reprod. Rights*, 2024 MT 54; *Planned Parenthood of Mont.*, 2024 MT 178. The Court continues to push in the direction of absolutism. While *Armstrong* required "legal standards for medical practice . . . be grounded in the methods and procedures of science and in the collective professional judgment . . . of the medical community," *Armstrong*, ¶ 62, today's decision more broadly holds that the "[d]etermination of the viability of a fetus *is subsumed within the health care*

94

*provider and patient relationship* and the medical judgment of the health care provider." Opinion, ¶ 34 (emphasis added). Without citation, the Court reasons that "[u]ntil a fetus is viable and able to survive outside the womb, the right of personal autonomy belongs to the person on whose body the fetus depends." Opinion, ¶ 35.

¶158 Ever-broadening proclamations will reciprocally diminish the role of the Legislature in serving the State's highest purpose of protecting human life. For instance, how is the State to ensure the "medical judgment of the health care provider" is consistently sound and not driven by "political ideology" that *Armstrong* said it wanted to avoid, unless it can exercise the power of regulation? To whom will the right of personal autonomy belong when a six-week-old fetus no longer depends on a woman to sustain it, but on an artificial womb? Whose decision-making authority must we rely upon when a surrogate is told she must terminate her pregnancy because the intended parents are no longer financially able to support a child?

¶159 Reminiscent of *Roe*'s undermining of political efforts to resolve abortion, the Court further departs from the Constitutional Convention's expressed intention to involve the Legislature in this issue by again failing, in my view, to give sufficient importance to the State's interest in preserving and protecting human life, including both the mother and the unborn. The State has no greater interest than the protection and preservation of human life. Essential to both personal and societal survival, the mere action of ascribing the protection of human life a "compelling interest" is to undermine it by failing to capture its full significance. Preservation of human life is, of course, completely necessary for the survival of our species and our government. Early political philosopher John Locke, whose

views were influential to our revolution, noted that government exists to protect the "natural rights" of individuals, including—in this order—the rights to life, liberty, and property. John Locke, *Second Treatise of Government*, ch. II, § 6, Project Gutenberg (Apr. 22, 2003). "[B]eing all equal and independent," wrote Locke, "no one ought to harm another in his life, health, liberty, or possessions." Locke, *Second Treatise*, ch. II, § 6. Our country was founded on these same principles. The Declaration of Independence states: "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness." *The Declaration of Independence* para. 2. This idea carried through to the Bill of Rights: "No person . . . shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Shortly after serving as the United States' third President, Thomas Jefferson wrote: "[t]he care of human life and happiness *and not their destruction is the first and only legitimate object* of good government." Thomas Jefferson, *To the Republicans of Washington County, Maryland, 31 March 1809*, National Archives Founders Online, *available at* https://perma.cc/E42T-QLE6 (emphasis added). Reflecting on Jefferson's quote in an era in which *Roe* controlled, President George W. Bush stated: "Consistent with the core principles about which Thomas Jefferson wrote, and to which the Founders subscribed, we should peacefully commit ourselves to seeking a society that values life—from its very beginnings to its natural end." George W. Bush, *National Sanctity of Human Life Day, 2002*, The White House Proclamation Archives (Jan. 18, 2002) *available at* https://perma.cc/AQ8V-L35J. An abortion right that extends to personal election without

96

a requirement of demonstrating the necessity to protect the life of the mother prevents the State from exercising its foremost duty to protect both mother and unborn. As the Supreme Court held, upholding *Roe* would mean the "Constitution requires the States to regard a fetus as lacking even the most basic human right—to live—at least until an arbitrary point in a pregnancy has passed." *Dobbs*, 597 U.S. at 263, 142 S. Ct. at 2261. Such a threshold of when life becomes worthy enough for the State to assert a compelling interest to protect it does not exist in other areas of Montana law, including code provisions governing negligence and homicide. *See* § 45-5-102(1)(c), MCA ("A person commits the offense of deliberate homicide if . . . the person purposely or knowingly causes the death of a fetus of another with knowledge that the woman is pregnant") (abortionists are specifically exempted from this statute by § 45-5-116(1)(a), MCA); *see also Strzelczyk v. Jett*, 264 Mont. 153, 158, 870 P.2d 730, 733 (1994) (holding that a party may be civilly liable for the wrongful death of an unborn fetus); *City of Missoula v. Asbury*, 265 Mont. 14, 18-19, 873 P.2d 936, 938 (1994). Lost in the Court's reasoning is that abortion is not merely a medical procedure, but the taking of human life—defenseless, helpless, choiceless, and innocent—with a unique genetic structure and heartbeat. In my view, the Court's decisions are essentially preventing the State from taking any action in furtherance of its highest interest in preserving that life. The State should be able to assert a compelling governmental interest in preserving all life, even that of the unborn. *See Dobbs*, 597 U.S. at 263, 142 S. Ct. at 2261.

**The Challenged Bills**

¶160   It should first be noted that courts are to "indulge[] every possible presumption" in favor of a statute's constitutionality.  *State ex rel. Sparling v. Hitsman*, 99 Mont. 521, 526-27, 44 P.2d 747, 750 (1935).

¶161   In striking down HB 136, HB 171, and HB 140, the Court concludes the State does not "demonstrate a compelling interest in and obligation to legislate or regulate [the abortion procedure] to preserve the safety, health and welfare of a particular class of patients or the general public from a medically-acknowledged, bonafide health risk." Opinion, ¶¶ 52-54, 67, 79-81, 84, 119; *Armstrong*, ¶ 59.  I disagree.  If the State has a right to act upon its interest in preserving life, the challenged bills should not be dismissed as entirely unconstitutional.

¶162   In passing HB 136, known as the "Pain-Capable Unborn Child Protection Act," the Legislature sought to prohibit the abortion of an unborn child who can feel pain unless "necessary to prevent a serious health risk to the unborn child's mother." 2021 Mont. Laws ch. 307, § 3.  The bill states that unborn children are capable of experiencing pain by "no later than 20 weeks gestational age." 2021 Mont. Laws ch. 307.  Because the bill regulates pre-viability abortions, the State's position is based upon a desire to mitigate fetal pain. Opinion, ¶¶ 54-56.  The State presented evidence indicating that an unborn child in the womb reacts to "stimuli that would be recognized as painful if applied to an adult human" and responds with "significant increases in stress hormones known as the stress response." The Court concludes HB 136 is underinclusive, stating there is no "medical consensus" as to when an unborn child may experience pain, nor is there any other "pregnancy-related

98

procedure" the State regulates based on when the unborn can experience pain. Opinion, ¶¶ 54-56. To be clear, abortion is the only "pregnancy-related procedure" in which the intended result is the ending of fetal life, and death commonly involves physical pain.[5] Appellees contend the State conflates pain with stimuli response, Opinion, ¶ 52, but it is not difficult to conclude that dismemberment or starvation from essential nutrients would be anything other than painful. Further, how else could pain be reasonably measured in a being who is living but cannot speak, except by observing their attempts to withdraw from the source of harm and by physiological signs of distress? The only meaningful difference between an unborn child exhibiting these responses and a newborn expressing what we know as "pain" may be the accompanying cry.

¶163    At a minimum, this issue should be tried to a factfinder, and not decided by summary judgment. In my view, the State has demonstrated a compelling interest in banning abortions, with narrow exceptions, beyond 20 weeks' gestation. Thus, the law is not facially violative of the right of privacy or equal protection clause of our state

---

[5] Abortion does not include, and must not be confused with, the removal of an ectopic pregnancy, which may result in the death of an unborn child. As defined by the Centers for Disease Control and Prevention (CDC), an abortion is "an intervention . . . intended to terminate a suspected or known intrauterine pregnancy and that does not result in a live birth." CDC, *How does CDC define abortion?*, CDC Abortion Surveillance System FAQs (2022) *available at* https://perma.cc/K8FK-87JQ. "Since an ectopic pregnancy is definitionally extrauterine and never viable, use of the term 'abortion' to define its termination is incorrect." Joel Rowe, M.D., et al., *The termination of an ectopic pregnancy is not an abortion*, Academic Emergency Medicine, Vol. 30, Iss. 8 (Aug. 2023), Letter to the Editor, *available at* https://doi.org/10.1111/acem.14712. Unlike abortion, the goal in treating an ectopic pregnancy is to save the lives of the mother *and* child, with "[b]old, state-level protections for life" likely leading to "innovations in ectopic care" that should boost success of preserving the life of the unborn in the rare case of an ectopic pregnancy in the future. Emma Waters and Connor Buss, *It's Time to Set Record Straight on Ectopic Pregnancies and Abortion*, The Heritage Foundation (Jul. 29, 2022) *available at* https://perma.cc/SYJ9-FLRH.

Constitution. I would remand HB 136 to resolve the disputed issues of material fact surrounding the time period in which a fetus is likely to experience pain in utero to ensure the law is narrowly tailored.

¶164 House Bill 171, the "Montana Abortion-Inducing Drug Risk Protocol Act," creates a ban on telehealth abortions, institutes a 24-hour waiting period for women seeking an abortion, requires physicians make "all reasonable efforts" to ensure women return for at least one follow-up appointment within two weeks of having an abortion, mandates abortion providers have specific credentials, and creates an "informed consent" form to be signed by any mother undergoing an abortion to verify she has been made aware of a multitude of risks and the availability of certain information described within the bill. 2021 Mont. Laws ch. 309, §§ 4, 5, 7-9. The Court focuses on the telehealth ban, 24-hour waiting period, and multiple in-person visits as being unduly burdensome to the mother, in violation of her right to abortion "because it impacts how and when a patient can get a pre-viability abortion." Opinion, ¶ 81. With this, the Court says the right of privacy extends not only to whether a pregnant mother may obtain an abortion, but to the ease in which she may go about doing so. Thus, while not explicitly adopting the "undue burden" test of the defunct *Casey* decision, that is essentially what this Court has done. The Court also maintains that the consent form violates a provider's free speech right because it constitutes "impermissible content-based restriction and viewpoint discrimination." Opinion, ¶ 97.

¶165 Waiting periods, "multiple visits," and even counseling requirements for women seeking abortions have been enacted in at least twelve states to achieve informed

100

decision-making. KFF, *Mandatory Waiting Periods for Women Seeking Abortions*, https://perma.cc/7NBA-4RTF (last accessed June 2, 2025). Informed consent is precisely one of the interests the Legislature sought to protect by enacting the waiting period in HB 171. *See* 2021 Mont. Laws ch. 309 ("a woman's ability to provide informed consent depends on the extent to which the woman receives information sufficient to make an informed choice"). A 24-hour waiting period between giving informed consent and undergoing an abortion does not interfere with a woman's ultimate exercise of her right to abortion. Along the same lines, providers' attempts to follow up with their patients do not violate the right of privacy. The language of the bill states:

> The qualified medical practitioner providing an abortion-inducing drug . . . *shall schedule* a follow-up visit for the woman at approximately 7 to 14 days after administration of the abortion-inducing drug to confirm that the pregnancy is completely terminated and to assess the degree of bleeding. The qualified medical practitioner *shall make all reasonable efforts to ensure that the woman returns* for the scheduled appointment.

2021 Mont. Laws. ch. 309, § 5(3) (emphasis added). Although the provider is required to schedule the appointment, there are no penalties for the woman who does not appear at the follow-up. The bill mandates two visits—one to diagnose, plan, and obtain informed consent, and the other to perform the abortion—which is consistent with routinely scheduled surgeries, and even some outpatient procedures. Requiring a period of reflection before proceeding with a life-altering decision should not reasonably be deemed an infringement upon a woman's rights. As a Court, we should be deferential to the Legislature's effort to encourage and ensure careful decision-making.

¶166 HB 171 does not present a free speech issue. The Court reasons, "[t]he State's mandated language that the procedure 'ends in the death of an unborn child' substitutes the government's determination about what abortion means for an individualized assessment by the medical professional and the patient." Opinion, ¶ 95. And further, that "[f]orcing medical providers to give medical advice that they disagree with . . . is a form of compelled speech triggering protections under Article II, Section 7, of the Montana Constitution." Opinion, ¶ 98. First, use of the term "unborn child" acknowledges the biological reality that life inside the womb is of the human species, with a distinct genetic identity, that would in the course of nature be born as the offspring of its biological mother and father. The term is not "medically inaccurate." *See Planned Parenthood of Mont.*, 2022 MT 157, ¶ 10 n.2 (abortion providers raised the same issue with terminology). Second, the consent form contemplated by HB 171 "must include" certain material, namely: "information about the possibility of reversing the effects of the chemical abortion if the pregnant woman changes [her] mind and that time is of the essence," that "information [from] initial studies suggest that children born after reversing the effects of an abortion-inducing drug have no greater risk of birth defects than the general population and that . . . there is no increased risk of maternal mortality after reversing the effects of an abortion-inducing drug." 2021 Mont. Laws ch. 309, § 7(5). But the law does not prohibit the consent form from including other information. 2021 Mont. Laws ch. 309, § 7(5). A provider could readily include information about believed inefficacy of abortion reversal techniques. The consent form could also include language about "the potential risk of carrying a pregnancy to term," a provision the District Court said was "conspicuously absent" from the bill. Opinion, ¶ 100.

102

None of the statements included in HB 171's consent form language describe abortion reversal as entirely safe or effective. Even acknowledging division within the medical community as to the efficacy of prescribing high amounts of progesterone to offset abortion-inducing drugs, HB 171 does not require providers to give medical advice that they disagree with. Nor does it mandate one viewpoint to the exclusion of others. Therefore, the bill does not violate free speech.

¶167 I agree that other parts of HB 171 are problematic. Regarding the telehealth ban and credentialing requirements, we have previously held that Montanans are allowed access to telehealth abortions. *Planned Parenthood of Mont.*, 2024 MT 227, ¶ 27. HB 171 prohibits the provision of abortion-inducing drugs via telehealth or any other remote platform, even when medical supervision and informed consent can be achieved. 2021 Mont. Laws ch. 309, § 4. HB 171 also requires abortion providers be credentialed to handle "complications" associated with the procedure. 2021 Mont. Laws ch. 309, § 5. I agree that the State has not demonstrated how these provisions are narrowly tailored. The provision banning telehealth abortions is simply overbroad; all abortion-related evaluations, information pertaining to informed consent, and any scheduled follow-up can be completed using remote means. When offered the opportunity to view an ultrasound or listen to fetal heart tone, a mother seeking a telehealth abortion can simply decline. Information can be, and should be, provided via telehealth with the same goals of achieving informed consent as any in-person visit. Likewise, the credentialing requirements within HB 171 are not consistent with the State's interests because the State cannot reasonably

expect to disseminate information regarding the risks of abortion by limiting the number of providers who perform abortion to a select few.

¶168 HB 171 contains a severability clause which states: "If a part of [this act] is invalid, all valid parts that are severable from the invalid part remain in effect." Mont. Laws ch. 309, § 16. As the Court notes, we may strike provisions of a law and uphold others only if doing so "will not frustrate the purpose or disrupt the integrity of the law." Opinion, ¶ 113 (citing *Williams*, ¶ 65). I do not believe striking the telehealth ban or credentialing requirements of HB 171 would frustrate the purpose of the legislation, which centers primarily on providing pregnant women with information and quality care surrounding abortion. I would, therefore, sever Sections 4 and 5 of HB 171 and uphold the remainder of the legislation.

¶169 House Bill 140 requires that a woman be given the opportunity to view an ultrasound and listen to fetal heart tone before an abortion. 2021 Mont. Laws ch. 308, § 1(1). The law also requires the woman sign a form indicating she was informed of her ability to view an ultrasound and listen to fetal heart tone, and whether she chose to do so. 2021 Mont. Laws ch. 308, § 1(3). As noted by the Court, the woman is free to decline the ultrasound, but the Court rejects "the State's assertion that HB 140 does not infringe a privacy right simply because it presents the option." Opinion, ¶ 121. The State asserts a compelling interest in providing patients with informed consent and protecting the life of the mother in presenting her with the option of obtaining an ultrasound before abortion, noting that the most effective abortion method varies depending on gestational age and that prescribing the medication abortion pill to a woman with an ectopic pregnancy can result in serious

complications, such as hemorrhaging or a ruptured fallopian tube. Yet, the Court simply does "not accept the State's argument that the offer is designed to reduce the risk of ruling out dangerous conditions, such as an ectopic pregnancy, or to help determine whether a medication abortion or dilation and evacuation abortion is appropriate by confirming the gestational age" because "abortion care is safe." Opinion, ¶ 122. The Court reasons that HB 140 violates the right of privacy "because it inserts the State's voice and judgment into the medical room," where it is "within the provider's judgment" whether to offer an ultrasound in the first place. Opinion, ¶ 121. Additionally, the Court notes: "there are times when offering an ultrasound or the option to listen to the fetal heart tone would be contraindicated—such as in cases of rape or incest—and the state-created form uses stigmatizing language." Opinion, ¶ 121.

¶170 However, requiring that a woman be informed of an opportunity does not violate the right of privacy under the Montana Constitution. Even *Armstrong* recognized the State has a compelling interest in preserving the life of the mother, and we have recognized the importance of providing informed consent before patients undergo medical procedures. *See Armstrong*, ¶ 68 (recognizing the State's compelling interest in enacting regulations to protect "persons with constitutional status"); *Collins*, 160 Mont. at 467-68, 503 P.2d at 40. The State produced credible evidence supporting the fact that women face health risks if abortionists misdiagnose the gestational age or location of their pregnancies. This legislation may have infringed upon a woman's ability to obtain a pre-viability abortion if it *required* the woman to obtain an ultrasound—constituting a true "mandate"—but this

105

bill does not.  Nevertheless, the Court holds HB 140 violates a woman's right to make medical judgments in partnership with her health care provider.  Opinion, ¶ 121.

¶171   I do not agree that legislation that provides a woman with the opportunity to choose whether to view an ultrasound violates her right to make private medical decisions with her provider.  The Legislature may have wanted women to have the opportunity to hear or see the fetus because a mother's instinct of protection, once she recognizes the life within her, is generally strong.  I cannot accept the argument that viewing or hearing the heartbeat of an unborn child may be imprudent, specifically in instances when that child was conceived by rape or incest.  This necessarily devalues the unborn life based on the circumstances surrounding its conception, and devalues the dignity of the mother and her right of decision-making.  HB 140 leaves the decision to obtain an ultrasound and listen to fetal heart tone between a patient and provider and does not infringe on a woman's right to privacy.  HB 140 should be upheld in its entirety.

¶172   I concur and dissent.


/S/ JIM RICE